1

2

3          *POSTED ON WEBSITE*
           *NOT FOR PUBLICATION*

4

5          **UNITED STATES BANKRUPTCY COURT**

6          **EASTERN DISTRICT OF CALIFORNIA**

7

8

9   In re                                    )   Case No. 14-91565-E-7
                                             )
10  RICHARD CARROLL SINCLAIR,                )
                                             )
11          Debtor.                          )
    _____ )
12                                           )
    ANDREW KATAKIS; CALIFORNIA               )   Adv. Proc. No. 15-9009
13  EQUITY MANAGEMENT GROUP, INC.,           )   Docket Control No. HAR-2
    a California corporation; and FOX        )
14  HOLLOW OF TURLOCK OWNERS'                )
    ASSOCIATION,                             )
15                                           )
            Plaintiffs,                      )
16                                           )
    v.                                       )
17                                           )
    RICHARD CARROLL SINCLAIR,                )
18                                           )
            Defendant.                       )
19  _____ )

20  **This Memorandum Decision is not appropriate for publication.**
    **It may be cited for persuasive value on the matters addressed.**

21

22          **MEMORANDUM OPINION AND DECISION**
    **Motion for Summary Judgment Filed by Andrew Katakis,**
23  **California Equity Management Group, and Fox Hollow of Turlock Owners' Association**

24          Andrew Katakis, California Equity Management Group, Inc., and  Fox Hollow of Turlock

25  Owners' Association (collectively "Katakis Plaintiffs"), the Plaintiffs in this Adversary Proceeding,

26  have filed a Motion for Summary Judgment.  Motion, Dckt. 74.  This Adversary Proceeding is just

27  one of many actions, lawsuits, appeals, adversary proceedings, and contested matters between

28  Katakis Plaintiffs and Richard Sinclair, the Defendant (referred to as "Defendant-Sinclair" or

"Mr. Sinclair" in this Ruling). The Motion for Summary Judgment seeks a judgment that Defendant-Sinclair's obligation on the state court judgment Katakis Plaintiffs obtained in the amount of $1,066,503.52, plus interest, costs, and expenses ("Final State Court Judgment") in *Mauctrst, LLC et al. v. Katakis et al.*, California Superior Court, County of Stanislaus Case No. 332233 ("State Court Action") is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) [actual fraud] and 11 U.S.C. § 523(a)(6) [willful and malicious injury]. The Statement of Decision upon which the Final State Court Judgment is based has been filed in support of the Motion for Summary Judgment as Exhibit 5 ("State Court Decision"). Dckt. 78. Katakis Plaintiffs assert that the findings and determinations in the Final State Court Judgment and the State Court Decision are to be given preclusive effect pursuant to the doctrine of collateral estoppel. The Final State Court Judgment arises out of litigation relating to real property in Turlock, California, which is referred to as the "Fox Hollow Property" in this Ruling.

Further, Katakis Plaintiffs assert that the findings and determinations of the State Bar Court in *In the matter of Richard Carroll Sinclair*, Member No. 68238, Case Nos. 13-O-10657-PEM, 13-O-11618 (Cons.) ("State Bar Court Action"), are to be given preclusive effect pursuant to the doctrine of collateral estoppel. It is asserted that such findings support the relief requested by Katakis Plaintiffs and that such findings and determinations cannot be relitigated by Defendant-Sinclair in this (or any other) proceeding. The Decision and Order for Involuntary Inactive Enrollment ("State Bar Court Decision") has been filed in support of the Motion for Summary Judgment as Exhibit 12. Dckt. 79.

The court has reviewed the extensive, almost two decades long, battles between Katakis Plaintiffs and Defendant-Sinclair in two recent decisions in Defendant-Sinclair's bankruptcy case, Bankr. E.D. Cal. No. 14-91565 ("Bankruptcy Case"), in this court. The first is the Memorandum Opinion and Decision granting the motion of the Chapter 7 Trustee in Defendant-Sinclair's Bankruptcy Case to settle claims and counterclaims of the estate with Katakis Plaintiffs. 14-91565; Dckt. 535. The second is this court's Memorandum Opinion and Decision sustaining the Chapter 7 Trustee's objection to Defendant-Sinclair's claim of a personal injury exemption in the "malicious prosecution suit" (term as used by Defendant-Sinclair on Schedules B and C filed under penalty of

perjury) against Katakis Plaintiffs. *Id.*, Dckt. 558. Those decisions contain extensive discussions of the litigation between these Parties and the Defendant-Sinclair's general litigation strategy.

It is proper for the court to grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), Fed. R. Bankr. P. 7056. The alternative relief requested is that the court enter an order determining the material facts which are not genuinely in dispute and treating such facts as established in this case. Fed. R. Civ. P. 56(a), Fed. R. Bankr. P. 7056.

As a general rule, summary judgment motions are focused and nail down the "simple" undisputed facts. Here, the Motion for Summary Judgment has spawned the following pleadings:

| | | |
|---|---|---|
| A. | Motion for Summary Judgment | 16 Pages |
| B. | Motion Points and Authorities | 40 Pages |
| C. | Motion Declaration of Greg Durbin (Plaintiffs' Counsel) | 5 Pages |
| D. | Motion Declaration Exhibits | 36 Pages |
| E. | Motion Exhibits, Set 1 | 163 Pages |
| F. | Motion Exhibits, Set 2 | 148 Pages |
| G. | Motion, Statement of Undisputed Facts | 21 Pages |
| H. | Defendant-Sinclair Substantive Opposition | 96 Pages |
| I. | Defendant-Sinclair Procedural Opposition - Insufficient Service | 4 Pages |
| J. | Defendant-Sinclair Substantive Opposition Declaration | 14 Pages |
| K. | Defendant-Sinclair Procedural Opposition Declaration | 3 Pages |
| L. | Reply Memorandum to Opposition | 18 Pages |
| M. | Reply Objections to Opposition | 3 Pages |
| N. | Reply Declaration | 4 Pages |
| O. | Reply Declaration Exhibits | 46 Pages |
| P. | Defendant-Sinclair Supplemental Substantive Opposition | 26 Pages |
| Q. | Defendant-Sinclair Supplemental Substantive Opposition Declaration | 57 Pages |

One could well imagine a grizzled trial judge, applying the "scale test,"[1] summarily concluding that if this many pounds of "electronic paper" have to be produced for facts and legal issues that must not be genuinely in material dispute, they must all be in "genuine dispute." Such a conclusion would be incorrect with these parties, as the 700 pages of pleadings are well less than when these parties are fighting about matters that they both believe are "genuinely in material dispute."

The court grants the Motion for Summary Judgment, with judgment to be entered for Katakis Plaintiffs and against Defendant-Sinclair determining that the obligation arising under the

---

[1] This is a reference to the belief of many college students that professors and teaching associates just weigh term papers, giving A's to those with the greatest weight, not quality of content.

Final State Court Judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) [willful and malicious injury]. The Motion for Summary Judgment is denied without prejudice to adjudication of the claims, objections, and defenses to the claim that the obligation owed on the Final State Court Judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) [actual fraud], which shall be determined at trial.

The court also determines pursuant to Federal Rule of Civil Procedure 56(g) and Federal Rule of Bankruptcy Procedure 7056 that the findings, conclusions, and determinations of the California Superior Court and the California State Bar Court set forth in Addenda A and B, respectively, are determined to not be in material disputed in this Adversary Proceeding and are established for all parties and purposes in this Adversary Proceeding.

**TABLE OF CONTENTS**
**FOR MEMORANDUM OPINION AND DECISION**

Though the court concludes that there are no genuine disputes as to the material facts with respect to relief pursuant to 11 U.S.C. § 523(a)(6), the complexity of the opposition by Defendant-Sinclair and the extensive findings and determinations in the judgments and decisions of the California Superior Court and State Bar Court considered by this court for the application of collateral estoppel have resulted in a long Memorandum Opinion and Decision.[2] The court provides the following Table of Contents to the major sections of this decision:

**PART I** – Defendant-Sinclair's Procedural Opposition Asserting Inadequate Service and Katakis Plaintiffs' Request to Strike Defendant-Sinclair's Substantive Opposition as Untimely..................................................................................Pg. 5

**PART II** – Review of: (1) Katakis Plaintiffs' Motion for Summary Judgment; (2) Substantive Opposition Presented by Defendant-Sinclair; and (3) Supplemental Substantive Opposition Presented by Defendant-Sinclair....................................................Pg. 12

**PART III** – Findings and Determinations of State Court and State Bar Court Subject to Collateral Estoppel and Determined Not in Material Dispute Pursuant to Fed. R. Civ. P. 52(g) and Fed. R. Bankr. P. 7056...........................................................Pg. 41

---

[2] This court acknowledges that the structure of this Memorandum Opinion and Decision may be very detailed in explaining the numerous opposition grounds and addressing (for some, multiple times) each asserted by Defendant-Debtor. This is intentional and provides the reader with a sense of Defendant-Sinclair's repetitive, anything goes, take no prisoners, and throw everything at the court without regard to there being any legal merit or evidentiary support litigation strategy and conduct.

4

**PART IV** – Decision Denying Motion for Summary Judgment, Without Prejudice, Requesting Relief Pursuant to 11 U.S.C. § 523(a)(2), and Granting Motion for Summary Judgment for Relief Pursuant to 11 U.S.C. § 523(a)(6).....................................Pg. 48

# PART I

### DEFENDANT-SINCLAIR OPPOSITION BASED
### ON ALLEGED DEFICIENT SERVICE

The Motion for Summary Judgment was filed on January 23, 2017, and set for hearing on February 23, 2017 – 31 days later. No special notice period is provided in the Local Bankruptcy Rules for a motion for summary judgment. L.B.R. 7056-1. No special notice period is provided for a motion for summary judgment under either the Federal Rules of Civil Procedure or Federal Rules of Bankruptcy Procedure. The minimum notice required is 28 days as provided in Local Bankruptcy Rule 9014-1(f)(1), (f)(2)(A). The Certificate of Service filed for the Motion for Summary Judgment states that the Motion for Summary Judgment and supporting pleadings were served by U.S. Mail, deposited with the U.S. Postal Service, on January 26, 2017 – 28 days before the February 23, 2017 hearing date.

The initial opposition to the Motion for Summary Judgment was filed by Defendant-Sinclair on February 14, 2017, Dckt. 86 ("Substantive Opposition") and is 96 pages in length.

Defendant-Sinclair, by separate pleading, argued that the Motion for Summary Judgment should be denied or the hearing continued based on an assertion that the Motion for Summary Judgment documents were not received by him until February 10, 2017. Dckt. 89 ("Procedural Opposition"). Defendant-Sinclair asserts that this was one day before he had to have his opposition prepared and filed.

In addition to asserting a defect in service, Defendant-Sinclair also requests in the Procedural Opposition that the court issue injunctive relief and order the Trustee and Trustee's counsel to join the Defendant-Sinclair in his desired prosecution of the claims against Katakis Plaintiffs, which claims have previously been settled by the Chapter 7 Trustee.

Defendant-Sinclair asserts that there is a defect in service because the Motion for Summary Judgment and supporting pleadings were not mailed to his address at 8212 Oak View Drive, Oakdale, California, a residence he states he moved into in September 2016. The Certificate of

1  Service (Dckt. 85) states that the Motion for Summary Judgment and supporting pleadings were

2  mailed to Post Office Box 1628 in Oakdale, California, which Defendant-Sinclair identifies as the

3  Post Office Box used by him for his law practice before he was disbarred by the California Supreme

4  Court. Defendant-Sinclair asserts that Katakis Plaintiffs "knew" he was no longer operating his law

5  office and had moved into the Oak View Drive residence.

6        Defendant-Sinclair filed his Procedural Opposition Declaration providing his testimony

7  relating to this service dispute. Dckt. 88. He directs the court's attention to what he identifies as

8  the envelope in which the Motion for Summary Judgment and supporting pleadings were mailed.

9  Exhibit "Unnumbered" attached to Procedural Opposition Declaration, Dckt. 88. He opines in the

10  Procedural Opposition Declaration that the documents were not received at his post office box until

11  February 4, 2017, based on what appears to be a forwarding label placed on the envelope by the U.S.

12  Postal Service. However, the label does not state that February 4, 2017, is when the envelope with

13  the documents was received. Rather, it appears that this is the date the forwarding label was

14  prepared and the U.S. Postal Service forwarded the documents to Defendant-Sinclair.

15        Not surprisingly, Katakis Plaintiffs vigorously argue that Defendant-Sinclair's Procedural

16  Opposition should be overruled, concluding that Defendant-Sinclair's contentions that he has ceased

17  using the Post Office Box are false and that such contentions are without merit. Objection to

18  (Procedural) Opposition Based on Service, Dckt. 92. Therefore, Katakis Plaintiffs assert the court

19  should ignore the Substantive Opposition and issue a ruling on the Motion for Summary Judgment

20  based just on review of the Katakis Plaintiffs' pleadings. Greg Durbin, attorney for Katakis

21  Plaintiffs, personally joins the fray providing testimony about the application of the Local

22  Bankruptcy Rules and the record in this Adversary Proceeding and Defendant-Sinclair's Bankruptcy

23  Case. He directs the court to Defendant-Sinclair using the Post Office Box 1628 address as late as

24  February 14, 2017 (just nine days before the scheduled hearing on the Motion for Summary

25  Judgment) for pleadings filed in and in connection with the Bankruptcy Case.

26  ///

27  ///

28  ///

**Addresses of Record and Addresses Used by Defendant-Sinclair**
**in this Adversary Proceeding and Chapter 7 Bankruptcy Case**

As this court previously addressed in the Bankruptcy Case, Defendant-Sinclair is an attorney who was formerly licensed to practice law in the State of California. Though disbarred, this court has concluded, and continues to conclude, that Defendant-Sinclair is a highly educated, experienced attorney and business person. *See* 14-91565; Memorandum Opinion and Decision, Dckt. 535.

In this Adversary Proceeding, the court's official address of record for Defendant-Sinclair is:

> Richard Carroll Sinclair
> PO Box 1628
> Oakdale CA 95361

No change of address has been filed by Defendant-Sinclair in this Adversary Proceeding.

The pleadings filed by Defendant-Sinclair in this Adversary Proceeding document the address used by Defendant-Sinclair in this proceeding:

| Date Filed | Pleading | Address Stated on Pleadings by Defendant-Sinclair |
|---|---|---|
| 2017/02/14 Dckt. 89 | Procedural Opposition to Summary Judgment Motion, Notice Requirements Not Met | RICHARD C. SINCLAIR 8212 Oak View Drive OAKDALE, CA. 95361 |
| Dckt. 88 | Procedural Opposition Declaration of Richard Sinclair | |
| Dckt. 87 | Substantive Opposition Declaration of Richard Sinclair | |
| Dckt. 86 | Substantive Opposition to Summary Judgment Motion | |
| 2016/12/01 Dckt. 66 | Supplemental Status Report | RICHARD SINCLAIR PO Box 1628 OAKDALE, CA. 95361 |
| 2015/11/25 Dckt. 45 | Answer to Complaint | RICHARD C. SINCLAIR PO BOX 1628 OAKDALE, CA. 95361 |

In this Adversary Proceeding, Defendant-Sinclair has filed a limited number of documents. However, there have been a substantial number of documents filed by Defendant-Sinclair in the Bankruptcy Case. Taken at face value, Defendant-Sinclair's use of the street address rather than his

1    Post Office Box arises now, only in this Adversary Proceeding when he is trying to prevent the court

2    from considering and ruling on the Motion for Summary Judgment.  In his Procedural Opposition

3    and Procedural Opposition Declaration, Defendant-Sinclair offers no explanation why he would not

4    continue to use a post office box as a fixed locus for receiving his important mail, not only from his

5    former law practice and business dealings, but all of the  (trial and appellate) state and federal court

6    proceedings that he has been recently prosecuting and defending using the Post Office Box as his

7    mailing address.

8            Turning to Defendant-Sinclair's Bankruptcy Case, the court's address of record provided by

9    Defendant-Sinclair is:

10                       Richard Carroll Sinclair
                        PO Box 1628
11                      Oakdale CA 95361

12           In reviewing the court's files for the Bankruptcy Case, the records reflect Defendant-Sinclair

13   using the following addresses on his pleadings:

| Date Filed | Pleading Filed in Bankruptcy Case No. 14-91565 | Address Stated on Pleadings by Defendant-Sinclair |
|---|---|---|
| 2017/02/14 Dckt. 557 | Request for Judicial Notice in Support of Motion to Abandon | RICHARD C. SINCLAIR P.O. Box 1628 Oakdale, CA 95361 |
| 2017/02/14 Dckt. 556 | Declaration of Richard Sinclair in Support of Motion to Abandon | RICHARD C. SINCLAIR P.O. Box 1628 Oakdale, CA 95361 |
| 2017/02/14 Dckt. 555 | Notice of Motion to Abandon | RICHARD C. SINCLAIR P.O. Box 1628 Oakdale, CA 95361 |
| 2017/02/14 Dckt. 554 | Motion to Abandon | RICHARD C. SINCLAIR P.O. Box 1628 Oakdale, CA 95361 |
| 2017/01/20 Dckt. 542 | Supplemental Opposition to Bifurcation Motion | RICHARD C. SINCLAIR PO Box 1628 Oakdale, Ca. 95361 |
| 2017/01/11 Dckt. 539 | Request for Judicial Notice | RICHARD C. SINCLAIR PO Box 1628 Oakdale, Ca. 95361 |

8

| | | |
|---|---|---|
| 2017/01/11<br>Dckt. 538 | Supplemental Opposition to Bifurcation Motion | RICHARD C. SINCLAIR<br>PO Box 1628<br>Oakdale, Ca. 95361 |
| 2016/12/21<br>Dckt. 529 | Exhibit to Opposition to Motion to Approve Settlement<br>(The Exhibit is a copy of a current pleading that Defendant-Sinclair sought to file in the Stanislaus County Superior Court Action. The address listed for Defendant-Sinclair on the proposed pleading is: RICHARD C. SINCLAIR, P.O. Box 1628,Oakdale, CA 95361) | RICHARD C. SINCLAIR<br>P.O. Box 1628<br>Oakdale, CA 95361 |
| 2016/12/21<br>Dckt. 528 | Exhibit to Opposition to Motion to Approve Settlement | RICHARD C. SINCLAIR<br>P.O. Box 1628<br>Oakdale, CA 95361 |
| 2016/12/21<br>Dckt. 527 | Exhibit to Opposition to Motion to Approve Settlement | RICHARD C. SINCLAIR<br>P.O. Box 1628<br>Oakdale, CA 95361 |
| 2016/12/21<br>Dckt. 526 | Debtor's Claim For Exemptions, Request for Judicial Notice, Declaration of Richard Sinclair | RICHARD C. SINCLAIR<br>PO Box 1628<br>Oakdale, CA. 95361 |
| 2016/12/21<br>Dckt. 525 | Debtor's Claim for Exemptions | RICHARD C. SINCLAIR<br>PO Box 1628<br>Oakdale, CA. 95361 |
| 2016/12/21<br>Dckt. 524 | Debtor's Claim for Exemptions | RICHARD C. SINCLAIR<br>PO Box 1628<br>Oakdale, CA. 95361 |
| 2016/12/01<br>Dckt. 488 | Status Conference Statement | RICHARD C. SINCLAIR<br>P.O. Box 1628<br>Oakdale, CA 95361 |
| 2016/12/01<br>Dckt. 487 | Opposition to Motion to Approve Compromise | RICHARD C. SINCLAIR<br>PO Box 1628<br>Oakdale, CA 95361 |
| 2016/12/01<br>Dckt. 486 | Motion to Abandon State Court Action | RICHARD C. SINCLAIR<br>P.O. Box 1628<br>Oakdale, CA 95361 |
| 2016/11/28<br>Dckt. 485 | Status Conference Statement | RICHARD C. SINCLAIR<br>P.O. Box 1628<br>Oakdale, CA 95361 |
| 2016/11/22<br>Dckt. 484 | Supplemental Status Conference Statement | RICHARD C. SINCLAIR<br>P.O. Box 1628<br>Oakdale, CA 95361 |

| 2016/11/16<br>Dckt. 471 | Request for Judicial Notice | RICHARD C. SINCLAIR<br>PO Box 1628<br>Oakdale, Ca. 95361 |
|---|---|---|
| 2016/11/16<br>Dckt. 470 | Motion to File Fourth Amended Cross Complaint [in state court action], Declaration of Richard Sinclair, and Points and Authorities | RICHARD C. SINCLAIR<br>P.O. Box 1628<br>Oakdale, CA 95361 |
| 2016/11/16<br>Dckt. 469 | Exhibit to Motion to File Fourth Amended Cross Complaint<br>(The exhibit is a copy of the proposed fourth amended cross complaint which lists Defendant-Sinclair's address as: RICHARD C. SINCLAIR, P.O. Box 1628, Oakdale, CA 95361) | RICHARD C. SINCLAIR<br>P.O. Box 1628<br>Oakdale, CA 95361 |
| 2016/11/16<br>Dckt. 468 | Status Conference Statement | RICHARD C. SINCLAIR<br>P.O. Box 1628<br>Oakdale, CA 95361 |
| 2016/08/08<br>Dckt. 452 | Reply and Opposition to Objection to Claim of Exemptions | RICHARD C. SINCLAIR<br>PO Box 1628<br>Oakdale, CA. 95361 |

During the period of time from August 2016 through his latest filing on February 14, 2017, Defendant-Sinclair uniformly and continuously states on his pleadings that his address for these bankruptcy proceedings is: RICHARD C. SINCLAIR, P.O. Box 1628, Oakdale, CA 95361.

The only aberration from P.O. Box 1628, Oakdale, California, being Defendant-Sinclair's mailing address in the Bankruptcy Case and this Adversary Proceeding is in connection with the current Procedural Opposition to this Motion for Summary Judgment. The presentation of this Procedural Opposition appears to be solely an attempt to improperly deter, deflect, and prevent the court from addressing the Motion for Summary Judgment on its merits.

The court concludes that the contentions made in the Procedural Opposition - Notice Requirements Not Met, Dckt. 89, are without merit and have not been advanced in good faith. The court further concludes that Defendant-Sinclair's testimony under penalty of perjury in the Procedural Opposition Declaration in support of the contention that there is a defect in service, Dckt. 88, is not credible.[3] These statements are inconsistent with the objective facts shown by all

_____

[3] In making reference to assessing the "credibility" of Defendant-Sinclair's testimony, it is in connection with his Procedural Opposition that the Motion for Summary Judgment should be denied or

10

1    of the other documents Defendant-Sinclair filed in which he states (and knows that other parties and

2    the court will rely on) that his address for these bankruptcy proceedings is: RICHARD C.

3    SINCLAIR, P.O. Box 1628, Oakdale, CA 95361.

4          As discussed by the court in the two Memorandum Opinions and Decisions referenced

5    above, Defendant-Sinclair has manifested in this court a litigation strategy of saying whatever he

6    believes to be to his advantage, without regard to it being legally or factually supportable.  The

7    prominent part of Defendant-Sinclair's (who it must be remembered is a highly educated,

8    experienced attorney, notwithstanding having been disbarred) litigation strategy is to delay, deter,

9    and prevent the court from addressing matters on the merits, working hard to stay in what the court

10   has identified as a "litigation death spiral" with Katakis Plaintiffs.

11         Though denying the meritless assertion of defective service, Defendant-Sinclair has

12   presented his initial Substantive Opposition (96 pages) and Substantive Opposition Declaration

13   (14 pages).  In addition, as discussed below, the court has allowed Defendant-Sinclair to file his

14   Supplemental Substantive Opposition (26 pages) and Supplemental Substantive Opposition

15   Declaration (57 pages).  Defendant-Sinclair has extensively opposed the present Motion for

16   Summary Judgment, presenting the best opposition he could.

17         The request for a continuance is denied.

18
     **Denial of Request by Katakis Plaintiffs to Strike**
19   **Defendant-Sinclair's Substantive Opposition Pleadings as Untimely**

20         The court also denies the request of Katakis Plaintiffs to strike Defendant-Sinclair's

21   Substantive Opposition and rule based just on the pleadings filed by Katakis Plaintiffs.  It is obvious

22   that Katakis Plaintiffs have filed extensive pleadings, including a response to the Substantive

23   Opposition, fulling teeing up the issues for the court.  No prejudice has been shown by the delay in

24   Defendant-Sinclair in filing his Substantive Opposition.  If Katakis Plaintiffs needed more time to

25   respond, they could have requested an extension of time.

26   ────────────────

27   the hearing continued due to alleged defective service.  The court does not assess the "credibility" of the
     testimony provided by Defendant-Sinclair in connection with the substantive opposition to the Motion for
28   Summary Judgment issues and determining if there are material issues in genuine dispute with respect to
     the Final State Court Judgment.  Fed. R. Civ. P. 56(a), (g), and Fed. R. Bankr. P. 7056.

                                          11

The filing of pleadings and the failure to comply with the deadlines imposed by Local Bankruptcy Rule 9014-1(f)(1) are addressed in Local Bankruptcy Rule 9014-1(l), which provides:

> (l) Sanctions. Failure to comply with the requirements of this Local Rule or the provisions of other Local Rules applicable to motion practice shall constitute grounds, without limitation, to deny the motion, strike late-filed pleadings and documents, continue the hearing on the motion, deem the moving party to have waived the time limitations of 11 U.S.C. § 362(e), deny the offending party the ability to appear by telephone, or assess other appropriate sanctions.

The Local Rules do not impose a prophylactic "No Pleadings For You!" penalty for an untimely filing. Rather, the judge is left with a wide range of options to ensure that matters are fairly and properly addressed. Here, striking the Substantive Opposition might well likely be what Defendant-Sinclair would prefer, giving him a colorable issue on appeal to continue in the "litigation death spiral."

No prejudice is shown by allowing the belated filing of the Substantive Opposition. There is no surprise to what is asserted in the Substantive Opposition. Katakis Plaintiffs have provided their detailed response to the Substantive Opposition, which applies equally to the Supplemental Substantive Opposition. Determination of the Motion for the Summary Judgment on the merits is warranted and properly before the court.

# PART II

### REVIEW OF MOTION FOR SUMMARY JUDGMENT, DEFENDANT-SINCLAIR SUBSTANTIVE OPPOSITION, AND DEFENDANT-SINCLAIR SUPPLEMENTAL SUBSTANTIVE OPPOSITION

The consideration of the Motion for Summary Judgment begins with the Motion for Summary Judgment itself and the fundamental requirement for motion practice in federal court – the motion for summary judgment itself must state with particularity the grounds upon which the requested relief is based. Fed. R. Civ. P. 7(b), Fed. R. Bankr. P. 7007.

### Motion for Summary Judgment and Supporting Pleadings

The Motion for Summary Judgment states that Katakis Plaintiffs seek a determination that the Final State Court Judgment is nondischargeable. The Final State Court Judgment was affirmed on appeal by the California District Court of Appeal ("DCA") in *Sinclair v. Katakis et al.*, Cal. DCA

5th Cir.  No. F058822, 2013 Cal. App. Unpub. LEXIS 509 (2013) ("DCA Opinion").  Exhibit 9, Dckt. 79.

It is asserted by Katakis Plaintiffs that the findings and determinations in the State Court Action, which was between Katakis Plaintiffs and Defendant-Sinclair (and other allied, alter-ego parties of Defendant-Sinclair), are subject to the doctrine of collateral estoppel, which results in such findings and determinations being binding on the Parties in this Adversary Proceeding.

**Evidence Presented in Support of Motion for Summary Judgment**

Katakis Plaintiffs filed the following evidence in support of the Motion for Summary Judgment:

A.     Declaration of Greg Durbin, attorney for Katakis Plaintiffs.  Dckt. 80.  This testimony is summarized as follows:

    1.     Mr. Durbin and his firm substituted in as counsel for Katakis Plaintiffs in 2008 in the State Court Action.

    2.     A 36-day trial was conducted in the State Court Action.

    3.     Proof of Claim No. 4 filed by Katakis Plaintiffs is for the attorneys' fees and costs awarded in the State Court Action and appeal of the Final State Court Judgment.

B.     Declaration of Greg Durbin, attorney for Katakis Plaintiffs as testimony to authenticate the Exhibits A-C filed in support of the Motion for Summary Judgment. Dckt. 81.

C.     Exhibits A-C, Dckt. 81, consisting of (the subparagraph letter below corresponds to the Exhibit letter):

    (A)     Trial Brief of Defendants and Cross-Complainants California Equity Management, Inc. and Andrew Katakis, and Defendant Fox Hollow of Turlock Owners Association filed November 14, 2008.

    (B)     Proof of Claim 4 as amended, filed February 12, 2015.

    (C)     Proof of Claim 4 as amended, filed June 3, 2016.

D.     Request for Judicial Notice, Exhibits 1 - 13.  Dckt. 77.

E.     Exhibits 1-13, Dckts. 78 and 79, consisting of (the subparagraph number below corresponds to the Exhibit number):

    1.     Complaint, Stanislaus Superior Court Case No. 332233, filed April 24, 2003.

    2.     Fifth Amended Complaint, Stanislaus Superior Court Case No. 332233, filed May 18, 2005.

3.      Defendants and Cross-Complainants Answer to Fifth Amended Complaint, Stanislaus Superior Court Case 332233,filed November 14, 2005.

4.      Statement of Decision, Stanislaus Superior Court Case No. 332233, filed August 18, 2009.

5.      Judgment, Stanislaus Superior Court Case No. 332233, filed August 18, 2009.

6.      Order on Defendants' Petition to Amended Judgment to Add Judgment Debtor, Stanislaus Superior Court Case No. 332233, filed April 5, 2010.

7.      Order on Motion to Determine Prevailing Party on Contract and Statute and Fix Amount of Attorney's Fees, Stanislaus Superior Court Case No. 332233, filed April 5, 2010.

8.      Amended Judgment, Stanislaus Superior Court Case No. 332233, filed June 21, 2010.

9.      Remittitur and Opinion, California Court of Appeal Case No. F058822, filed April 29, 2013.

10.     Remittitur and Opinion, California Court of Appeal Case No. F060497, filed March 25, 2013.

11.     Order and Judgment re: (1) Judgment Creditors' Motion for Attorneys' Fees against Mauctrst, LLC; (2) Judgment Debtor Stanley Flake, individually and as Trustee of Capstone's Trust Motion to Strike Costs; (3) Judgment Creditors, and Andrew Katakis, California Equity Management Group, Inc. and Fox Hollow of Turlock Owners' Association's Motion for Attorneys' Fees on Appeal; and (4) Costs on Appeal, filed in California Superior Court, Stanislaus County Case No. 332233, on December 30, 2013.

12.     Decision and Order of Involuntary Inactive Enrollment, In the matter of Richard Carroll Sinclair, Member No. 68238, Case Nos. 13-O-10657-PEM, 13-O-11618 (Cons.) State Bar of California, Hearing Department – San Francisco, filed herein July 28, 2015.

13.     State Bar of California attorney search results of Richard Carroll Sinclair, dated July 7, 2016.

**Statement of Undisputed Facts Filed By Katakis Plaintiffs**

Katakis Plaintiffs have filed their required Statement of Undisputed Facts. Dckt. 76. The Statement provides 109 asserted undisputed facts, the basis for the majority of such facts (106 of the 109) are the findings and determinations of the State Court, affirmed by the DCA, and the State Bar Court. The other three are based on the declaration of counsel for Katakis Plaintiffs. As this court addressed at the hearing on this Motion for Summary Judgment, there is little which is "undisputed" between these Parties – even when they are stated as part of a final judgment that has been affirmed

14

on appeal. This court could well envision that if the court were to rely on the paraphrased recitation of the findings and determinations by Katakis Plaintiffs, rather than quoting and adopting the exact language of the other courts' rulings, it may be asserted by Defendant-Sinclair that Katakis Plaintiffs committed "fraud on this court" in such paraphrasing. Therefore, rather than adopting the Statement of Undisputed Facts, the court will set forth in this ruling the findings and determinations which have been made in other courts for which the doctrine of collateral estoppel applies.

**Points and Authorities in Support of Motion for Summary Judgment**

Katakis Plaintiffs have filed their separate Points and Authorities as required by the Local Bankruptcy Rules and Revised Guidelines for the Preparation of Documents. Dckt. 75. The legal authorities and arguments will be considered in the discussion below concerning the law and application to the evidence presented to the court.

**Substantive Opposition and Opposition Pleadings
Filed by Defendant-Sinclair**

Defendant-Sinclair has filed the Substantive Opposition to the Motion for Summary Judgment asserting his detailed legal and factual bases for such opposition. Dckt. 86. The Substantive Opposition is 96 pages in length and addresses many issues. Defendant-Sinclair filed his 14-page Substantive Opposition Declaration addressing the factual issues raised in the Substantive Opposition. Dckt. 87.

Defendant-Sinclair then filed his Supplemental Substantive Opposition (26 pages) and Supplemental Substantive Opposition Declaration (57 pages) on March 13, 2017, which the court considers as part of Defendant-Sinclair's Substantive Opposition to the present Motion for Summary Judgment. Dckts. 96, 98.[4] The court reviews all of the detailed, extensive arguments, legal

---

[4] Defendant-Sinclair improperly filed these documents in Defendant-Sinclair's Bankruptcy Case as a motion for reconsideration of summary judgment and a declaration in support of motion for reconsideration. 14-91565; Dckt. 588, 590. Since the court had not yet issued a ruling on the Motion for Summary Judgment, the court issued an order authorizing the documents to be filed and considered by the court as supplemental opposition to the Motion for Summary Judgment. *Id.*; Order, Dckt. 596.

Copies of the Supplemental Substantive Opposition and Supplemental Substantive Opposition Declaration have been placed on the Docket in this Adversary Proceeding by the Clerk of the Court in this Adversary Proceeding. Dckts. 96 and 98, respectively, for the convenience of the Parties and any

authorities, and evidence presented by Defendant-Sinclair in detail to assure all parties that the contentions, arguments, and testimony under penalty of perjury of Defendant-Sinclair have been considered.

**Review of Substantive Opposition to Motion for Summary Judgment**

From the 96-page Substantive Opposition filed by Defendant-Sinclair (Dckt. 86), the court distills the following opposition grounds to the Motion for Summary Judgment.

Defendant-Sinclair first argues that the over 2,000 pages of exhibits previously filed in the Bankruptcy Case and related bankruptcy proceedings "prove" that counsel for Katakis Plaintiffs fraudulently obtained the Final State Court Judgment.

Further, in addition to fraudulently obtaining the Final State Court Judgment, it is asserted that counsel for Katakis Plaintiffs was also representing Defendant-Sinclair.

Further, Defendant-Sinclair contends that the Final State Court Judgment is infirm because he contends that counsel for Katakis Plaintiffs "lied" to the judge in the State Court Action concerning an alleged "disability" of Defendant-Sinclair, and then obtained the Final State Court Judgment while Defendant-Sinclair was "disabled."

Defendant-Sinclair then further argues that the 2,000 pages of exhibits filed in the various bankruptcy proceedings also "prove" that Defendant-Sinclair did not commit fraud. Defendant-Sinclair offers this evidence of 2,000 pages of exhibits as a counter to the findings and determinations made in the Final State Court Judgment, affirmed on appeal, State Court Decision, and State Bar Court Decision.

The Substantive Opposition continues, with Defendant-Sinclair asserting that fraud has been committed on the State Court thereby rendering the Final State Court Judgment void. He contends that the Final State Court Judgment, which has been affirmed on appeal, cannot therefore be given collateral estoppel effect. This harkens back to earlier proceedings in Defendant-Sinclair's Bankruptcy Case in which Defendant-Sinclair tried to induce this bankruptcy court to issue orders which would falsely purport to vacate the Final State Court Judgment, the DCA Opinion, and orders

other court reviewing these proceedings.

1    of the United States District Court. *See* discussion in this court's Memorandum Opinion and

2    Decision (14-91565; Dckt. 535 p. 2:18–3:17) for a discussion of Defendant-Sinclair's improper

3    attempt to mislead this court into purporting to vacate orders of other courts.

4          Defendant-Sinclair's Substantive Opposition then collaterally attacks the Final State Court

5    Judgment, DCA Opinion, and State Bar Court Decision, asserting that Katakis Plaintiffs, their

6    attorney, and the judge in the State Court Action all knew of Defendant-Sinclair's alleged

7    "disability" and proceeded to have the Final State Court Judgment, which has been affirmed on

8    appeal, entered against Defendant-Sinclair.

9          The Substantive Opposition continues, asserting that there was a purported settlement in the

10   State Court Action and that the Final State Court Judgment is improper because of such purported

11   settlement. Further, such argument collaterally attacks the DCA Opinion affirming the Final State

12   Court Judgment, which rejected the contention that there was such a purported settlement.

13         Defendant-Sinclair further argues that he has many civil law claims against Katakis

14   Plaintiffs, and it is not right that they have a judgment against him. As this court addressed in the

15   Memorandum Opinion and Decision sustaining the Chapter 7 Trustee's objection to Defendant-

16   Sinclair claiming a personal injury exemption in a "malicious prosecution case," these various

17   purported claims date back to 2003, more than a decade prior to when Defendant-Sinclair voluntarily

18   filed his Chapter 11 case. 14-91565; Memorandum Opinion and Decision, Dckt. 558. Not only did

19   Defendant-Sinclair have the opportunity to prosecute any such claims (to the extent such claims

20   actually exist) for years prior to voluntarily filing his Chapter 11 Bankruptcy Case, but then for a

21   year while protected in his Chapter 11 case and serving as the Chapter 11 debtor in possession, who

22   had the fiduciary responsible for diligently prosecuting such claims, to the extent they existed.

23         As addressed in the above-referenced Memorandum Opinion and Decision sustaining the

24   objection to exemption (14-91565, Dckt. 558), to the extent that such claims existed, they existed

25   prior to the commencement of the Bankruptcy Case by Defendant-Sinclair and had to be listed on

26   the Schedules, which are made under penalty of perjury, filed by Defendant-Sinclair. No such

27   claims were disclosed by Defendant-Sinclair when he filed his Chapter 11 case or in any schedules

28   (original or amended) filed by Defendant-Sinclair in his Bankruptcy Case. Rather, the existence of

1  such alleged claims was advanced by Defendant-Sinclair in the Bankruptcy Case when the Chapter 7

2  Trustee was moving toward a settlement resolving the almost two decades of disputes and any

3  claims (which, whether disclosed or not, are property of the bankruptcy estate) between Katakis

4  Plaintiffs and Defendant-Sinclair.

5          Beginning at the bottom of page 12 of the Substantive Opposition, Defendant-Sinclair begins

6  "arguing" evidence to support his contention that the Final State Court Judgment and the State Court

7  Decision are in error.  These contentions may have been relevant in the State Court Action, in a

8  motion (presumably promptly filed) to vacate the Final State Court Judgment, or possible for the

9  appeal of the Final State Court Judgment (to the extent that this evidence was in the record from the

10  36-day trial), but not for a collateral attack in federal court on the Final State Court Judgment.

11  Defendant-Sinclair is again attempting to have this court ignore or relitigate the Final State Court

12  Judgment and findings of the State Court as the basis of his Substantive Opposition.

13  **Legal Authorities Portion of Substantive Opposition**

14          The Substantive Opposition contains extensive citations to legal authorities and asserts

15  arguments addressing the following points.

16          First, Defendant-Sinclair cites authority for the proposition that fraud committed on a court

17  is grounds for having a judgment set aside.  No legal authorities are presented for how such a

18  contention of fraud to set aside the Final State Court Judgment is properly raised in this federal

19  court.  While the citations and arguments in this section of the Substantive Opposition are long, they

20  do not present any effective opposition to the present Motion for Summary Judgment.

21          In reality, what these arguments demonstrate is that to the extent that such grounds could

22  exist, Defendant-Sinclair has known of them for years (with some of the events dating back to 2003).

23  However, Defendant-Sinclair failed to act on any such perceived wrongs for the years prior to the

24  appointment of the Chapter 7 Trustee after Defendant-Sinclair's Bankruptcy Case was converted

25  to one under Chapter 7 in December 2015.

26          Second, Defendant-Sinclair's argument appears to be cycling back to demand that this

27  bankruptcy court could reach out and void final judgments and final orders of the State Court and

28  the District Court.  No authority for such a proposition is provided in the Substantive Opposition.

Third, Defendant-Sinclair appears to attempt to weave an argument that Defendant-Sinclair's Constitutional rights were impinged upon because of his inability to prosecute his action because of a "disability." Again, the Substantive Opposition is long on argument but without legal support for how the attempted collateral attack of the Final State Court Judgment in this court is a legally effective opposition to the Motion for Summary Judgment.

Fourth, the Substantive Opposition legal argument appears to be recycling and miscasting this court's orders and rulings when it addressed in the Fall of 2015 Defendant-Sinclair's contention that he was then "disabled" in the Bankruptcy Case. Though repeatedly requesting the doctors who Defendant-Sinclair professed stated he was disabled come forward (as opposed to Defendant-Sinclair merely testifying what he said the doctors said to him), no doctors ever provided the court with any testimony or information to the court.

This court, to the extent that a disability might have actually existed and Defendant-Sinclair was unable to communicate the need to his doctor for such expert testimony, instructed the Clerk of the Court to send a copy of the detailed order identifying the need for such information to the doctor identified by Defendant-Sinclair. The order expressly requested that the doctor purported to be treating Defendant-Sinclair provide such information, which would appear to be consistent with that doctor's obligations to her patient if Defendant-Sinclair actually suffered from such alleged disability. No doctor stepped forward to present such information in support of the alleged disability asserted by Defendant-Sinclair.

The court issued a detailed decision concluding that Defendant-Sinclair was competent and that the purported disability was a sham. 14-91565; Civil Minutes, Dckt. 337. While professing a "disability," Defendant-Sinclair was actively prosecuting the Bankruptcy Case. Defendant-Sinclair appeared to be "disabled" only with respect to the U.S. Trustee attempting to have the case converted and Katakis Plaintiffs conducting discovery. The court findings in the Civil Minutes recount the conduct of Defendant-Sinclair which was inconsistent with the professed disability. *Id*.

In the Memorandum Opinion and Decision approving the proposed settlement of claims between Katakis Plaintiffs and the Chapter 7 Trustee, this court addressed not only Defendant-Sinclair's use of an alleged "disability" to delay judicial proceedings, but Defendant-Sinclair's

1    conscious litigation strategy of asserting claims, rights, and defenses, without regard to whether they

2    had any legal merit or are supported by facts, so long as they fit within his narrative to advance his

3    position. 14-91565; Memorandum pp. 14:27–20:16, Dckt. 535. Based on his conduct in the

4    proceedings in the Bankruptcy Case and the adversary proceedings related thereto, this court has

5    concluded that Defendant-Sinclair's litigation strategy in this court is to say whatever he thinks can

6    serve his interests, irrespective of the legal merit or truth, to deflect the court from making any

7    decision. This would then allow Defendant-Sinclair to continue in his never ending litigating and

8    relitigating disputes with Katakis Plaintiffs.

9          Fifth, Defendant-Sinclair, on page 77 of the Substantive Opposition, does address the legal

10    doctrine of Unclean Hands under California law. In citing to *Kendall-Jackson Winery, Ltd. v.*

11    *Superior Court*, 76 Cal. App. 4th 970 (1999), he directs the court to the following language in that

12    case:

13              Not every wrongful act constitutes unclean hands. But the
               misconduct need not be a crime or actionable tort. Any conduct that
14              violates conscience, or good faith, or other equitable standards of
               conduct is sufficient to invoke the doctrine.
15

16    Substantive Opposition, p. 77; Dckt. 86.

17          The gist of Defendant-Sinclair's argument is that Katakis Plaintiffs merely stating that there

18    was a finding of "Unclean Hands" is not a magic incantation resulting in a conclusion that the Final

19    State Court Judgment is nondischargeable. The conduct warranting the application of the Unclean

20    Hands defense may not have risen to fraud or willful and malicious injury. Defendant-Sinclair then

21    chooses to go further and argue, therefore, that the express findings of the State Court can never

22    mean that the obligation is nondischargeable, but instead it is the Katakis Plaintiffs that have been

23    shown to be the "bad guys."

24          The Substantive Opposition legal authorities then reargue that the Final State Court

25    Judgment should not be respected by this court as a final judgment and does not mean what it says

26    because Defendant-Sinclair says it is "wrong."

27          Sixth, Defendant-Sinclair does have a section of the Substantive Opposition specifically

28    stating legal authorities for his opposition to the present Motion for Summary Judgment. However,

1    most of it consists of cutting and pasting in a copy of Federal Rule of Civil Procedure 56, as well

2    as the rule for motions for judgment on the pleadings, the latter not the motion now before the court.

3          Seventh, the Substantive Opposition asserts that the Final State Court Judgment should not

4    be respected because Defendant-Sinclair submitted his own allegations that Katakis Plaintiffs have

5    committed "thirty-nine unclean hands."  In substance, Defendant-Sinclair asserts that based on his

6    contention of  "thirty-nine unclean hands of [Katakis Plaintiffs]," the Final State Court Judgment

7    is not a final determination for which collateral estoppel and *res judicata* apply.  Other than

8    Defendant-Sinclair making arguments and his using the phrase "unclean hands," no meritorious

9    legal authority is presented for this conjecture.

10          Eighth, Defendant-Sinclair then argues that under a Federal Rule of Civil Procedure 12(b)

11   motion only the pleadings can be considered.  Then, under Rule 12(c) a motion for judgment on the

12   pleadings can be recast as a motion for summary judgment.  Therefore, the evidence presented in

13   support of the Motion for Summary Judgment cannot be considered since it is not in the pleadings.

14   The Motion before the court is brought pursuant to Federal Rule of Civil Procedure 56(a) – not

15   Federal Rule of Civil Procedure 12(b) or 12(c).  Katakis Plaintiffs are not asserting a defense in this

16   adversary proceeding (a Federal Rule of Civil Procedure 12 presentation of defenses to a complaint),

17   but are prosecuting their Complaint against Defendant-Sinclair.  Again, other than Defendant-

18   Sinclair's argument, no meritorious legal authority is provided for this conjecture.

19          Ninth, Defendant-Sinclair asserts that he has other claims and causes of action which were

20   not included in the State Court Action.  Therefore, he concludes that Katakis Plaintiffs are prevented

21   from obtaining a summary judgment based upon the Final State Court Judgment which has been

22   affirmed on appeal. Again, Defendant-Sinclair offers no legal authority for this proposition.  Nor

23   does Defendant-Sinclair  address how he personally can have any such claim in light of all of those

24   rights coming out of the decades long dispute, which claims are property of the bankruptcy estate.

25   11 U.S.C. § 541.

26          Tenth,  Defendant-Sinclair discusses the application of *res judicata* and collateral estoppel,

27   providing the court with authorities on those points.

28          As is clear, while professing to not having been timely served with the Motion for Summary

1    Judgment and not having an adequate opportunity to state an opposition, Defendant-Sinclair has

2    filed an extensive legal and evidentiary, multifaceted, complex opposition.  In addition, the court

3    has allowed Defendant-Sinclair to file and has considered the extensive Supplemental Substantive

4    Opposition.

5    **Evidence Filed With Substantive Opposition to Motion for Summary Judgment**

6         Defendant-Sinclair has filed his Substantive Opposition Declaration with the Substantive

7    Opposition to the Motion for Summary Judgment.  Dckt. 87.  The testimony goes to reargue why

8    the determination of the State Court is in error and why Katakis Plaintiffs are bad people.  There is

9    not sufficient, substantive evidence countering and putting in genuine dispute any material facts or

10   issues determined in the Final State Court Judgment which has been affirmed on appeal, and the

11   final State Bar Court Decision which was adopted by the California Supreme Court in disbarring

12   Defendant-Sinclair.

13   **Review of Supplemental Substantive Opposition**

14        On March 13, 2017, before this court finished drafting and had not yet issued a ruling on the

15   Katakis Plaintiffs' Motion for Summary Judgment, Defendant-Sinclair filed a pleading titled

16   "Motion . . . For Reconsideration of Summary Judgment" and related supporting pleadings, which

17   were improperly filed in the Bankruptcy Case itself, not in this Adversary Proceeding.  The court

18   now considers the "reconsideration" pleadings, grounds, and additional evidence filed by Defendant-

19   Sinclair as the Supplemental Substantive Opposition to the Motion for Summary Judgment.  Order

20   recasting Motion to Reconsider as Supplemental Substantive Opposition, Dckt. 102.  Though largely

21   duplicative of the 96-page Substantive Opposition, the court has reviewed in detail the Supplemental

22   Substantive Opposition and puts to rest any contention that this court does not review, consider, and

23   evaluate the merits of the extensive pleadings filed by Defendant-Sinclair or other parties.

24        Though the court considers these supplemental pleadings, the court has not changed its

25   opinion that Defendant-Sinclair's contention that there was defective service (whether intentional

26   or inadvertent) of the Motion for Summary Judgment is without merit.  Defendant-Sinclair's

27   arguments and statements under penalty of perjury of having a different address for service of

28   pleadings for this Motion for Summary Judgment than all of the other pleadings he has filed in the

1    Bankruptcy Case and Adversary Proceeding are not credible. Those statements and arguments are

2    made by Defendant-Sinclair as part of his continuing scheme to engage in wrongful conduct.

3            On a second point, most, if not all, of what Defendant-Sinclair presents in the Supplemental

4    Substantive Opposition has been presented to the court in the Substantive Opposition to this Motion

5    for Summary Judgment. In addition, most of these contentions have been previously presented in

6    the Bankruptcy Case and other adversary proceedings related to the Bankruptcy Case.

7            The court addresses the arguments and opposition stated in the Supplemental Substantive

8    Opposition (Dckts. 96 and 98), even if they are already addressed in connection with the 97-page

9    Substantive Opposition previously filed by Defendant-Sinclair in outline form for ease of reading.

10           **1.    Defendant-Sinclair seeks to file a motion to vacate the Final State Court
                    Judgment based on fraud on the court. Supplemental Substantive Opposition,**
11                  **pp. 2, 9, 10, 11, 12.**

12           In making this contention, Defendant-Sinclair asserts that he was disabled and unable to

13   defend himself in the State Court Action – notwithstanding Defendant-Sinclair having litigated the

14   36-day trial in the State Court Action. This court has independently found that contentions by

15   Defendant-Sinclair of a "disability" in prior proceedings during the Bankruptcy Case were

16   unsubstantiated, not credible, and false. Rather, the "disability" contention arises when Defendant-

17   Sinclair is on the verge of losing, or has lost, something that he is prosecuting or is being prosecuted

18   against him.

19           The Final State Court Judgment was entered in 2009. Since that time Defendant-Sinclair

20   actively litigated the State Court Action, prosecuted the appeal of the Final State Court Judgment,

21   and then prosecuted the Chapter 11 Bankruptcy Case as the debtor in possession until, when the

22   proceedings were turning against him, Defendant-Sinclair feigned a "disability."

23           If a *bona fide*, good faith, basis for setting aside the Final State Court Judgment existed,

24   Defendant-Sinclair would have (as the highly educated, experienced attorney he is) prosecuted that

25   in the State Court Action, at least during the six-year period in which he was actively prosecuting

26   the 36-day trial in the State Court Action, the appeal of the Final State Court Judgment, and the

27   Bankruptcy Case as the debtor in possession. He did not and does not offer any reasonable, good

28   faith reason for it not having been done in the years during the state court litigation, the trial, the

1  appeal, and the post-appellate period in which Defendant-Sinclair was actively litigating his

2  Chapter 11 case as the debtor in possession.

3         Asserting this as a basis for opposing the Motion for Summary Judgment is consistent with

4  the conclusions of this court of Defendant-Sinclair engaging in a now two decades long scheme of

5  intentional, wrongful conduct, without any just cause or excuse, to injure others in his attempts to

6  improperly obtain or retain the economic benefits of the Fox Hollow Property.

7

8
         **2.      Defendant-Sinclair asserts that he was deprived of his Fifth and Fourteenth
                  Amendment Rights based on his "disabilities." *Id.*, pp. 2, 9.**

9         Little legal analysis is provided, and there is no evidence, other than Defendant-Sinclair

10  stating his personal conclusion that he was "disabled." As is clearly shown for the period from 2009

11  through 2015, there was no disability as Defendant-Sinclair actively prosecuted various actions and

12  proceedings in the State Court, the DCA, and this court.

13        While Defendant-Sinclair states that there is no limitation to when he can assert that a fraud

14  was perpetrated on the State Court, he offers no reasonable, honest explanation as to why he did not

15  bring that to the attention of the State Court during the 2009 to 2015 time period. He offers no

16  reasonable, honest explanation as to why only now, after the Chapter 7 Trustee has settled all claims

17  with Katakis Plaintiffs, that Defendant-Sinclair finally wants to pursue such relief.

18        Contrary to Defendant-Sinclair's contention that he has been deprived of the ability to assert

19  such claims, for six years Defendant-Sinclair chose not to assert any claim of fraud on the State

20  Court. Instead, he now asserts it as part of his intentional, wrongful conduct, without just cause or

21  excuse scheme to abuse not only Katakis Plaintiffs, but both the federal and state judicial processes.

22

23
         **3.      In 2016, Defendant-Sinclair submitted to the "court" (presumably he is
                  referencing this bankruptcy court) evidence of fraud having been committed on
                  the State Court, but the "court" would not hear it. *Id.*, p. 3.**

24        There was a request that Defendant-Sinclair previously slipped into an opposition to a motion

25  filed by Katakis Plaintiffs in the Bankruptcy Case that the court should vacate the Final State Court

26  Judgment for fraud. Defendant-Sinclair could offer the court no authority for his proposition that

27  a federal bankruptcy judge could issue orders vacating the Final State Court Judgment, the DCA

28  Opinion affirming the Final State Court Judgment, or orders entered by the United States District

Court.

This contention was advanced by Defendant-Sinclair in his "Opposition to Motion to Convert to Chapter 7 and Request to Set Aside Judgment" ("Opposition/Motion to Vacate") 14-91565, Dckt. 87. Many of the same arguments and grounds set forth in the Supplemental Substantive Opposition as to improper conduct by Katakis Plaintiffs are stated in the Opposition/Motion to Vacate. In the Opposition/Motion to Vacate Defendant-Sinclair filed on February 13, 2015 (while the Defendant-Sinclair was the debtor in possession and in control of all claims and rights of the bankruptcy estate), Defendant-Sinclair states:

    a.    Katakis Plaintiffs committed criminal foreclosure fraud in obtaining the Final State Court Judgment;

    b.    Defendant-Sinclair has turned "this matter" over to the "US Criminal attorneys at the USDC for the Eastern District of California" and the Anti Trust Division of the Department of Justice;

    c.    Katakis Plaintiffs have been criminally stalking Defendant-Sinclair since 1994;

    d.    In 2003 Defendant-Sinclair warned Katakis Plaintiffs that the criminal stalking had risen to criminal extortion and to cease such criminal actions.

    e.    Notwithstanding Defendant-Sinclair having notified Katakis Plaintiffs to cease the criminal stalking and criminal extortion in 2003, it did not stop.

    f.    Defendant-Sinclair asserts that a district court judge in 2010 concluded that Defendant-Sinclair was "disabled" (quotations in original), Katakis Plaintiffs proceeded to obtain the judgment in the State Court Action. (This was the 36-day trial Defendant-Sinclair litigated.)

    g.    In litigating the State Court Action in 2010, Katakis Plaintiffs committed a fraud on the State Court.

    h.    As debtor in possession, Defendant-Sinclair states he has refiled RICO claims against Katakis Plaintiffs in the action pending before the District Court.

    i.    Defendant-Sinclair was prosecuting litigation against the Neumiller Beardslee law firm, which was to go to trial in Fall of 2015, to recover $25 Million.

    j.    There is no statute of limitations for any of Defendant-Sinclair's claims for fraud on the court.

    k.    Defendant-Sinclair anticipated being able to generate $30,000.00 to $50,000.00 a month in income from his law practice.

    l.    Defendant-Sinclair was going to modify his Oakdale home office (for which Defendant-Sinclair argued that his multi-year lease was unenforceable because he did not reduce it to writing when he transferred his home office into his trust and made the trust purportedly irrevocable), and turn it into a senior citizens assisted

1    living center.

2    m.    The court should not "assist" Katakis Plaintiffs in profiting from his criminal
           foreclosure fraud and "80 Unclean Hands."

3

4    n.    The court should not review any of the transfers made by Defendant-Sinclair to his
           separated wife because they were made pursuant to a marital settlement agreement
5          for which the family law judge entered an order on the agreement between
           Defendant-Sinclair and his wife.

6    o.    The bankruptcy judge should set aside the final judgment in the State Court Action,
           the final decision of the DCA affirming the Final State Court Judgment, and order
7          of the United States District Court judge.

8         Both orally and in the written decision set forth in the Civil Minutes on the hearing on the

9    motion to convert, the court explained the impropriety in Defendant-Sinclair requesting this

10   bankruptcy court to vacate orders issued by other federal and state court judges.

11

12        Furthermore, the request to vacate itself is improper. The Debtor is requesting that
          this court vacate orders of both a state and federal court judge. The scope of Fed. R.
          Civ. P. 60 allows this court only to vacate orders that are issued by this court. The
13        Debtor here is seeking to have this court overreach its jurisdictional authority and
          vacate orders, none of which are specifically pled in Debtors nonsensical opposition,
14        of both a district court and state court. This is plainly improper.

15   14-91565. Civil Minutes, Dckt. 113 at 4.

16        Such a contention by Defendant-Sinclair also runs afoul of the Full Faith and Credit Clause

17   of the U.S. Constitution Article IV, § 1 and 28 U.S.C. § 1738.  A federal court cannot merely ignore

18   or refuse to enforce an order of the state court merely because one of the parties seeks to assert that

19   "the state court judge was wrong, the other side committed fraud." As Defendant-Sinclair, a highly

20   educated and experienced attorney knows (and knew when he previously tried to mislead this court

21   into entering  improper orders purporting to vacate the Final State Court Judgment, DCA Opinion,

22   and district court orders), there was no merit to the request in 2015 and there is no merit to the

23   argument in the Supplemental Substantive Opposition.

24        Once again Defendant-Sinclair offers no legal authority for his proposition that he should

25   be able to, and this federal court has the jurisdiction to, vacate orders of other courts.

26   ///

27   ///

28   ///

**4.    Katakis Plaintiffs committed criminal foreclosure fraud and other crimes, which date back to 2003 and continued thereafter.** *Id.* **at pp. 2, 3, 4, 5, 6, 13.**

Defendant-Sinclair argues that since he contends that Katakis Plaintiffs have committed crimes and torts, this court should preemptively not give Full Faith and Credit to the Final State Court Judgment and the DCA Opinion affirming it on appeal.  Defendant-Sinclair seeks to have this court presume all of his contentions are true and correct, turning the court into merely serving as Defendant-Sinclair's instrument to enter whatever order Defendant-Sinclair demands.

In reality, dissatisfied with his 36 days in court for the trial in the State Court Action and the appeal to the DCA, Defendant-Sinclair seeks to relitigate the Final State Court Judgment, contending that it is "wrong" because "Katakis Plaintiffs are bad guys," and therefore giving Full Faith and Credit to the Final State Court Judgment is just "wrong."

If crimes have been committed, Defendant-Sinclair (as a highly educated and experienced attorney) can notify the proper authorities.  His belief that such crimes may have existed since 2003 is not a basis for ignoring the Final State Court Judgment.

**5.    Defendant-Sinclair was not allowed to be a party to the settlement negotiations between the Chapter 7 Trustee and Katakis Plaintiffs which was approved by the court.** *Id.* **at pp. 10, 11.**

Defendant-Sinclair objects to, after he was removed from being the debtor in possession and lost the ability to control property of the bankruptcy estate, the Chapter 7 Trustee settling with Katakis Plaintiffs without recovering additional value for Defendant-Sinclair.  He further asserts that the Trustee failed to obtain a dismissal of the Final State Court Judgment for Defendant-Sinclair.

Defendant-Sinclair weaves into this portion of the arguments his contentions of all the wrongs done against him and fraud committed on other courts.

Defendant-Sinclair further contends that the court approved the settlement without considering Defendant-Sinclair's opposition or the exhibits (more than 2,000 pages) filed in opposition.  Defendant-Sinclair pounds his drumbeat that he was "disabled" and was just unable to assert the fraud on the court claims.  However, all the while Defendant-Sinclair was litigating the 36-day trial, appeal of the Final State Court Judgment, and the Chapter 11 Bankruptcy Case as the debtor in possession.

Defendant-Sinclair's contention that the court did not consider his opposition to the Motion to Approve Compromise is not only incorrect, it is a blatantly false statement. The Motion for Approval of Compromise of Controversies with Katakis Plaintiffs was filed on November 17, 2016. 14-91565, Dckt. 476. Defendant-Sinclair filed his 13-page opposition to the Trustee's Motion to Approve Compromise. 14-91565; Dckt. 487. The Opposition to Motion to Approve Compromise lays out Defendant-Sinclair's contentions that he (actually meaning the bankruptcy estate) now has more than $40 Million of claims against Katakis Plaintiffs. He argues that he has more than 2,500 pages of exhibits that are to be reviewed. However, in substance, the argument is that Defendant-Sinclair now asserts having more than $40 Million of claims dating back to 2003 – none of which were listed on Schedule B filed by Defendant-Sinclair under penalty of perjury.[5]

In this court's Memorandum Opinion and Decision granting the Motion for Approval of Compromise of Controversies, consideration of these now asserted claims, and the credibility of Defendant-Sinclair, is addressed. 14-91565; Dckt. 535. In addition, to afford Defendant-Sinclair and his allies[6] the ability to preserve such claims if they had such significant value, the court gave Defendant-Sinclair's allies the opportunity to exercise a right of first refusal to purchase all of the asserted $40 Million of claims for the $40,000.00 offered by Katakis Plaintiffs. *Id.*; Order, Dckt. 499.

Defendant-Sinclair and his sister, Kathryn Machado, PhD ("Dr. Machado") the trustee and managing member of the trust and limited liabilities companies receiving transfers of property from Defendant-Sinclair prior to the commencement of the Bankruptcy Case, appeared at the hearing for the motion to approve the Katakis Plaintiffs settlement obtained by the Trustee. As addressed by this court in the Memorandum Opinion and Decision (*Id.*; Dckt. 535), if these claims were worth

---

[5] All that was listed by Defendant-Sinclair for such claims was, "Katakis case for malicious prosecution plus Truax case...approx $6 million." 14-91565; Schedule B filed in Defendant-Sinclair's Bankruptcy Case, Dckt. 42 at 3.

[6] The "allies" identified by the court are Deborah Sinclair, Defendant-Debtor's wife, and Kathryn Machado, PhD, his sister. Defendant-Sinclair has disclosed that his wife (pursuant to a marital settlement agreement) and Dr. Machado (as the trustee of Defendant-Sinclair's purported irrevocable trust and the managing member of limited liability companies) both received significant transfers of assets from Defendant-Sinclair prior to his commencing the Bankruptcy Case.

significantly more than the $40,000.00 settlement amount (Defendant-Sinclair asserting they were worth 1,000-times more), then either the wife or sister, using the significant assets transferred to them by Defendant-Sinclair prior to the filing of the Bankruptcy Case, could have, and likely would have, purchased such claims.  Neither took advantage of such rights of first refusal.  When pressed on the point at the hearing, Dr. Machado's counsel advised the court that all Dr. Machado wanted was to be done with the Defendant-Sinclair's bankruptcy proceedings and not have to come back to the bankruptcy court.

Defendant-Sinclair's revisionist history of the hearing is not merely a mistake, but affirmative misstatements of what occurred.  Defendant-Sinclair's complaint that he, after years, if not decades, of not asserting any of the purported claims, was wrongly not allowed to exercise control over or take whatever he wanted from the estate and use (or misuse) it as part of his continuing scheme of intentional, wrongful actions to harm Katakis Plaintiffs and others in his endeavor to retain or obtain further financial benefits from the Fox Hollow Property is without merit.

      **6.**     **Defendant-Sinclair asserts that the "court" (presumably the bankruptcy court) has refused to follow the rules, deprived Defendant-Sinclair of his Fifth and Fourteenth Amendment Rights, ignored the criminal conduct of Katakis Plaintiffs, promoted Katakis Plaintiffs' counsel's fraud committed on the State Court in 2009, and removed all evidence that Katakis Plaintiffs owed Defendant-Sinclair $12.425 Million.  Supplemental Substantive Opposition, pp. 7, 8.**

This portion of the Supplemental Substantive Opposition is merely a recycling of his repeated prior arguments and "evidence" that the Final State Court Judgment cannot be enforced by Katakis Plaintiffs because it is "wrong" and Defendant-Sinclair believes a fraud was committed years ago on the State Court.  Though having more than two decades of dealings in his scheme involving the Fox Hollow Property and more than a decade of having the purported claims against Katakis Plaintiffs, Defendant-Sinclair did not take any action to assert such "rights" and "claims."  In more recent time, during the period of 2010 through the Summer of 2015, Defendant-Sinclair litigated a 36-day trial, the appeal of the Final State Court Judgment, and the Bankruptcy Case as debtor in possession, but did not see $40 Million value in such claims to be prosecuted by him.

But when the Chapter 7 Trustee was finally bringing to an end the Katakis Plaintiffs portion of the Fox Hollow Property scheme by Defendant-Sinclair, the $40 Million in "claims" materialized.

1   The contentions that the Final State Court Judgment was obtained by fraud were retreaded and run

2   out to the court.

3          A review of the court's files readily shows that all of the oppositions, evidence, arguments,

4   and contentions of Defendant-Sinclair have been considered. The court has even taken extra steps

5   to insure that Defendant-Sinclair has been able to present his positions and evidence to the court.

6   When Defendant-Sinclair asserted that he had a "disability," the court made sure that the doctor who

7   purportedly stated Defendant-Sinclair had a disability, as well as Defendant-Sinclair's sister (Dr.

8   Machado), as trustee of the trust and managing member of the limited liability companies, had notice

9   of these proceedings in the event that Defendant-Sinclair was incapable of communicating the need

10  for assistance. None came forward in support of Defendant-Sinclair and his disability contentions.[7]

11         The Supplemental Substantive Opposition offers no basis for denying the Motion for

12  Summary Judgment. Rather, it demonstrates that the Defendant-Sinclair is continuing in his scheme

13  of intentional and wrongful acts, for which there is no just cause or excuse, done to cause further

14  injury to Katakis Plaintiffs.

15  **Supplemental Substantive Opposition Declaration of Defendant-Sinclair[8]**

16         The Supplemental Substantive Opposition Declaration of Defendant-Sinclair was filed on

17  March 13, 2017. Dckt. 98. Defendant-Sinclair's testimony is the first seven pages of the

18  Supplemental Substantive Opposition Declaration. The next 50 pages consist of a proposed fourth

19  amended cross-complaint that Defendant-Sinclair would file in a state court action that has been

20  settled by the Chapter 7 Trustee, if the Defendant-Sinclair were not in bankruptcy or was still the

21  debtor in possession. The proposed fourth amended cross-complaint seeks to assert claims which

22  Defendant-Sinclair represents date back to 2003. These alleged claims have not been included in

23

24  ───────────────

25         [7] As discussed *infra*, not only was Dr. Machado at Defendant-Debtor's side at proceedings in the
    Bankruptcy Case while Defendant-Debtor was the debtor in possession (the fiduciary of the bankruptcy
26  estate), Defendant-Debtor was her attorney defending her against potential fraudulent conveyance claims
    for (exercising rights to recover for the bankruptcy estate) the transfers she had received pre-petition.

27         [8] Though titled "Declaration," the Supplemental Substantive Opposition Declaration contains
28  extensive citations, legal authorities, and legal arguments in addition to personal knowledge testimony
    (Fed. R. Evid. 601, 602).

prior litigation advanced by Defendant-Sinclair in his litigation with Katakis Plaintiffs and were not listed on his bankruptcy schedules, which schedules are stated under penalty of perjury. With the demanded trebling, it appears that Defendant-Sinclair may now be asserting that these various claims (which are property of the bankruptcy estate) now top $75 Million – in Defendant-Sinclair's current opinion.

Defendant-Sinclair begins by repeating his prior statements and testimony about the Motion for Summary Judgment being served at the wrong address and Defendant-Sinclair not receiving it in time to file an opposition. Supplemental Substantive Opposition Declaration, p. 1, Dckt. 98. Just as this was not credible before, it is not credible now. Defendant-Sinclair was able to file on March 13, 2107, his massive Substantive Opposition to the Motion for Summary Judgment. Then, when the court authorized the filing of the Supplemental Substantive Opposition, a month later, it duplicates what Defendant-Sinclair presented in the original Substantive Opposition.

Defendant-Sinclair then testifies that "the court" (presumably the bankruptcy court) was aware that he intended to file a "Notice of Motion of Fraud on the Court" in the State Court Action. This desire of the Defendant-Sinclair to attack the Final State Court Judgment has been addressed several times by this court. No reasonable, substantive testimony is provided why Defendant-Sinclair, who actively litigated the 36-day trial in the State Court Action, the appeal of the Final State Court Judgment, and the Bankruptcy Case over a five-year period never sought to prosecute this attack on the Final State Court Judgment. Instead, it appears to be the next in a series of acts in his scheme (discussed in the 11 U.S.C. § 523(a)(6) portion of this Ruling) relating to the Fox Hollow Property. Defendant-Sinclair's testimony under penalty of perjury that he was disabled and that precluded him from taking that action in the post 2009 State Court Trial was and is unbelievable – not that he presents fantastic, compelling testimony, but his testimony is not reasonable and fails to state any evidentiary basis for Defendant-Sinclair failing to act in the past, if such claims actually existed.

Further, his testimony discusses a purported disability that ran into February 2010. *Id.*, p. 2. Nothing substantive, reasonable, or credible (in prior proceedings in the Bankruptcy Case) has been provided about any "disability" later in 2010, 2011, 2012, 2013, 2014, or 2015. As determined by

1   this court when Defendant-Sinclair purported to have a "disability" when creditors and the

2   U.S. Trustee were at the door to have the case converted or dismissed, no disability existed. Rather,

3   the feigned "disability" was part of Defendant-Sinclair's litigation strategy to improperly derail his

4   opponents and impede the judicial process.

5        The Supplemental Substantive Opposition Declaration continues, repeating from the original

6   Substantive Opposition and other pleadings filed in the Bankruptcy Case, Defendant-Sinclair's

7   alleged "disabilities," alleged fraud on the State Court, alleged denial of his Fifth and Fourteenth

8   Amendment Rights, and alleged criminal conduct of Katakis Plaintiffs. *Id.*, pp. 3, 4, 5. What

9   Defendant-Sinclair never substantively addresses is why no action was taken in 2010, 2011, 2012,

10  2013, 2014, and 2015 when he could have brought such claims and gone to the State Court to have

11  his contention of fraud on the State Court properly adjudicated.

12       Defendant-Sinclair now contends that this court, the bankruptcy court, deprived him of his

13  Fifth and Fourteenth Amendment rights because he was, or is, incompetent. *Id.*, p. 6. As in the

14  Bankruptcy Case, Defendant-Sinclair does not produce a doctor to provide the court with competent

15  medical testimony. Rather, it is just Defendant-Sinclair re-rearguing in his Supplemental

16  Substantive Opposition Declaration that he was "disabled" and the court has to accept Defendant-

17  Sinclair's unilateral conclusions on that point. As discussed in this Ruling and the extensive ruling

18  in determining that Defendant-Sinclair was and is competent, the court went to great lengths to get

19  the identified doctor to come forward if Defendant-Sinclair was "disabled." No doctor came

20  forward. The Defendant-Sinclair's sister, Dr. Machado, was at his side through most of the

21  Bankruptcy Case proceedings, during which time Defendant-Sinclair was his sister's attorney,

22  defending the transfers of property to the trust and limited liability companies against fraudulent

23  transfer claims which the Defendant-Sinclair, as the debtor in possession, had the fiduciary duty to

24  prosecute.

25       Additionally, as the court noted in the Bankruptcy Case, if Defendant-Sinclair was actually

26  incapacitated, his sister, who was by his side and is also highly educated (having earned a PhD)

27  would have gone to state court to have a conservator appointed for him or sought a personal

28  representative appointed in federal court. Not only did the sister not do this, she was so confident

1    in his competency that she had Defendant-Sinclair represent her in the Bankruptcy Case up until the

2    time he was initially suspended from the practice of law in July 2015 (which, not coincidently, is

3    when Defendant-Sinclair professed to have an undocumented "disability"). Then, even after he had

4    been disbarred, Dr. Machado had Defendant-Sinclair by her side "advising" her for several months

5    after his disbarment until the court required her to obtain counsel (since a trust and limited liability

6    companies were the actual parties, not her individually in *pro se*).

7           Defendant-Sinclair continues to "testify" that the court (presumably the bankruptcy court)

8    ignored the bad acts of counsel for Katakis Plaintiffs and "promoted" such counsel's fraud in the

9    State Court Action. *Id.*, p. 7. Because the court did not find persuasive, or credible, evidence

10   asserted by Defendant-Sinclair, he makes the statement that "in essence, the court struck all evidence

11   that proved" the improper conduct of Katakis Plaintiffs and their attorneys. He further contends

12   that the court "managed to remove all evidence that [Katakis Plaintiffs] owe [Defendant-Sinclair]

13   $12.425 million and have no damages." *Id.* No evidence was erased. No evidence was removed.

14   Merely because the court did not believe Defendant-Sinclair that tens of millions of dollars of claims

15   have materialized since the filing of the Bankruptcy Case in late 2014 does not mean the evidence

16   was not presented and considered. The evidence did not support Defendant-Sinclair's contention

17   that the Chapter 7 Trustee should not administer the bankruptcy estate, that the Chapter 7 Trustee

18   should not settle disputes with Katakis Plaintiffs, and Defendant-Sinclair's contention that he can

19   do whatever he wants, irrespective of federal bankruptcy law. The manufactured alleged tens of

20   millions of dollars of claims is just part of Defendant-Sinclair's continuing scheme to intentionally

21   engage in wrongful conduct, without just cause or excuse, which necessarily causes injury to others

22   as he tries to obtain or retain economic value and advantage from the Fox Hollow Property.

23   **Asserted Reporting of Crime Requirement**

24          In the Points and Authorities portion of the Supplemental Substantive Opposition,

25   Defendant-Sinclair makes a unique argument – that the court is obligated to report the crimes which

26   Defendant-Sinclair alleges occurred because Defendant-Sinclair so demands. Supplemental

27   Substantive Opposition, pp. 18, 19, 20, 21.

28          First, Defendant-Sinclair is a highly educated attorney and well capable of reporting the

asserted crimes to the proper federal and state authorities.  In his pleadings he states that he has already reported them to the county sheriff, attorneys at the U.S. District Court, and the Anti-Trust Division.  To the extent that Defendant-Sinclair's contentions have any merit, this court is convinced that the parties to whom Defendant-Sinclair has reported would act properly.

In contending that this court has to "report the felony" which Defendant-Sinclair asserts occurred, he first cites the court to 18 U.S.C. § 4, which states:

> § 4. Misprision of felony
>
> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

All that has been presented to this court is Defendant-Sinclair's contention that a crime has occurred, which is now being asserted in an effort to derail the Chapter 7 Trustee in administering the bankruptcy estate in the Bankruptcy Case, including the Katakis Plaintiffs' settlement obtained by the Trustee.  Defendant-Sinclair admits that he has already reported the alleged crimes to federal and state authorities.  Just as Defendant-Sinclair would be outraged if the court were to "re-report" that Defendant-Sinclair committed a crime merely because it was alleged by Katakis Plaintiffs (which they have not), it is improper for Defendant-Sinclair to try and turn the court into his pawn merely because his scheme of wrongful conduct includes allegations of alleged crimes to deter, delay, and prevent the court from addressing the merits of the Motion for Summary Judgment.

Defendant-Sinclair can contact the U.S. Attorneys' Office and provide whatever information he believes proper, and be subject to all of the certifications, warranties, and conditions that go with such complaints.

Defendant-Sinclair then cites the court to 28 U.S.C. § 1362, contending that it allows a district court judge to issue a writ of *mandamus* to compel an officer of the United States to "perform his duty."  *Id.*, p. 20.  Based on this, Defendant-Sinclair states:

> This Court is prohibited from ordering damages where no damages exist to the criminal who caused the problem and his attorneys who are likewise aware but do nothing to perform their duties.

1    *Id.* While making such statement, Defendant-Sinclair fails to provide any authority for this court,

2    subject to the Full Faith and Credit Clause of the U.S. Constitution and 28 U.S.C. § 1738  giving

3    collateral estoppel effect to the Final State Court Judgment.

4    **Asserted Conflict of Interest**

5            Defendant-Sinclair appears to now assert that he owned some of the Fox Hollow Property

6    when Katakis Plaintiffs' counsel was representing the Fox Hollow Home Owner's Association

7    (referred to as "FHOA" or "HOA").  Therefore, he asserts that counsel for FHOA also represented

8    Defendant-Sinclair personally as an owner (or former owner) in connection with the Final State

9    Court Judgment which was affirmed on appeal.

10           The State Court denied, without prejudice, that Katakis Plaintiffs' counsel in the State Court

11   Action (the same counsel in this Adversary Proceeding) had the above disqualifying conflict.  On

12   appeal, the DCA affirmed the denial of the motion to disqualify and did not find there to be a

13   disqualifying conflict in issuing the DCA Opinion. DCA Opinion, pp. 26–28. Exhibit 9, Dckt. 79.

14           Defendant-Sinclair attempted to resurrect this contention of a conflict in the second appeal

15   he took to the DCA, contesting the award of attorney's fees.  Exhibit 10, *Sinclair v. Katakis et al.*,

16   DCA F060497 ("DCA Attys Fee Opinion").   There, the DCA recounts that the current counsel for

17   the Katakis Plaintiffs did not substitute into the State Court Action until February 2008, ten months

18   before the trial in the State Court Action.  DCA Attys Fee Opinion, p. 11.  The DCA noted that the

19   issue of a possible conflict was not raised by Defendant-Sinclair and the Other State Court Action

20   Plaintiffs (*infra*) until three years after becoming aware of the alleged conflict.  No excuse was

21   offered by Defendant-Sinclair or the Other State Court Action Plaintiffs.  The DCA sustained

22   denying Defendant-Sinclair's renewed request to disqualify Katakis Plaintiffs' counsel, drawing two

23   inferences from the delay and conduct of Defendant-Sinclair:

24
             1.   Defendant-Sinclair's delay in raising the disqualification issue is also an
25                indication that they did not view the alleged conflict of interest as serious or
                  substantial; and
26
             2.   **Defendant-Sinclair's delay in raising the disqualification motion is a**
27                **tactical device to delay the litigation.**

28   *Id.*, pp. 12-13.

                                          35

1    It appears, having lost in the State Court and having lost in the DCA, Defendant-Sinclair is

2    seeking to fight a rear guard action to collaterally attack the Final State Court Judgment and the final

3    DCA Opinion on this point to improperly induce this court to not give Full Faith and Credit to the

4    Final State Court Judgment and the DCA Opinion.

5    A number of inconsistencies in this rear guard action arise, beyond there already being a final

6    determination as it relates to the Final State Court Judgment and the findings of the State Court that

7    are being presented to this court for consideration under the doctrine of collateral estoppel.  In

8    looking at the State Court Complaint filed and prosecuted by Defendant-Sinclair, he clearly states

9    that Mauctrst, LLC acquired the Fox Hollow Property.  State Court Complaint, ¶ 1; Exhibit 1,

10   Dckt. 78.  The State Court Complaint further states that subsequent entities Lairtrust, LLC and

11   Capstone, LLC acquired one lot each in Fox Hollow.  On its face, the State Court Complaint does

12   not state Defendant-Sinclair has or had any interest in the Fox Hollow Property.  *Id.*, ¶ 5.  As to

13   Defendant-Sinclair, the State Court Complaint only asserts that Andrew Katakis threatened

14   Defendant-Sinclair to try and prevent the State Court Complaint from being filed by Defendant-

15   Sinclair as the attorney for the Other State Court Action Plaintiffs in the State Court Action.  *Id.*, ¶ 7.

16   In the Fifth Amended State Court Complaint filed by Defendant-Sinclair, the ownership of

17   Fox Hollow Property by Mauctrst, LLC is repeated.  Fifth Amended State Court Complaint, ¶ 13;

18   Exhibit 2, Dckt. 78.  It is further repeated that Lairtrust, LLC and Capstone, LLC each subsequently

19   acquired one lot each of the Fox Hollow Property.  *Id.*, ¶ 18.

20   First, as shown in the State Court complaints, Defendant-Sinclair filed complaints in which

21   he did not purport to be an owner of property included in the Fox Hollow Property.  Even if

22   Defendant-Sinclair's theory that a homeowners association could never have counsel to litigate with

23   any owners of property included in the association is an accurate statement of the law, Defendant-

24   Sinclair has told the State Court that he, personally, is not such an owner.  Defendant-Sinclair's

25   complaint against Katakis Plaintiffs was that he believed he had been personally "threatened" to

26   improperly deter the filing of the State Court complaint, and subsequent State Court amended

27   complaints.

28   Second, Defendant-Sinclair chose to file the State Court Complaint and Fifth Amended State

36

1    Court Complaint which affirmatively took the fight to FHOA, as well as Andrew Katakis and

2    California Equity Management Group, Inc.   Defendant-Sinclair now complains that FHOA has

3    hired attorneys to defend itself against the claims Defendant-Sinclair prosecuted in the State Court

4    Complaint.  No legal basis has been provided for such a contention.

5          Third, Defendant-Sinclair offers no evidence that (1) he was a member of the FHOA or

6    (2) that he was a member of the FHOA board when current counsel for Katakis Plaintiffs represented

7    the FHOA.  Then, Defendant-Sinclair offers no meritorious legal argument that if he was a board

8    member or an owner of property, the FHOA could not engage its counsel to represent it against

9    Defendant-Sinclair, including claims asserted by Defendant-Sinclair as counsel for others.

10         Fourth, this issue of an alleged conflict was addressed in the State Court Action and by the

11   DCA as discussed in the DCA Opinion.   In substance, Defendant-Sinclair argues that

12   notwithstanding the Final State Court Judgment, notwithstanding the DCA Opinion, and

13   notwithstanding the DCA determining that Defendant-Sinclair had no colorable claim on that issue

14   relating to the Final State Court Judgment, Defendant-Sinclair presses that already concluded issue

15   in this court, demanding that this court not give Full Faith and Credit to the Final State Court

16   Judgment.

17         Fifth, Defendant-Sinclair offers no specifics about any representation provided to Defendant-

18   Sinclair as either a member of the FHOA or as a former member of the FHOA.[9]  From the evidence

19   presented, by the time Katakis Plaintiffs and their current counsel enter into the picture, Defendant-

20   Sinclair's involvement with the Fox Hollow Property and FHOA had come to an end.

21         Sixth, this Adversary Proceeding is a "natural offspring" of the State Court Action which was

22   spawned by Defendant-Sinclair (as counsel for the other plaintiffs in the State Court Action and

23   whatever interests he had in the State Court Action ) in prosecuting the state court action against

24   Katakis Plaintiffs, which include FHOA.  The "litigation" of this Adversary Proceeding has

25

26         [9] As discussed *infra*, Defendant-Sinclair has told varying stories under oath about whether the
     members of the FHOA that pre-dated the current board had resigned, who they were, and whether they
27   asserted any rights or interests.  What the evidence has shown is that Defendant-Sinclair was hired to be
     the counsel for FHOA during the period prior to Katakis Plaintiffs acquiring the Fox Hollow Property and
28   the former board was replaced, after the prior board members gave their notice of resignation through
     Defendant-Sinclair.

1    consisted of the findings of the State Court in the State Court Decision, and the rulings of the DCA

2    in the DCA Opinion and the DCA Attys Fee Opinion (*infra*).  This is merely an action to continue

3    in the enforcement of the Final State Court Judgment for which the State Court and the DCA

4    determined that no such conflict existed for Katakis Plaintiffs' counsel.

5         Seventh, this "conflict" allegation is merely a smoke screen for Defendant-Sinclair to try and

6    relitigate the final determinations in the Final State Court Judgment, State Court Decision, and DCA

7    Opinion.  In the conclusion of his Supplemental Substantive Opposition, Defendant-Sinclair

8    demands that "this court [bankruptcy court] has a duty . . . [to] . . . grant Richard Sinclair judgment

9    and deny the MOTION FOR SUMMARY JUDGMENT and also nullify the judgments in 332233

10   and any that might be made in federal case no: 1:03 cv 05439."  Supplemental Substantive

11   Opposition, p. 25, Dckt. 96.

12        In the Substantive Opposition, Defendant-Sinclair's conclusion further demands "Plaintiff

13   [Katakis Plaintiffs'] Motion for Summary Judgment must be denied.  Judgment on the pleadings

14   does not apply.  Summary judgment does not apply.  There must first be a 'final judgment,' without

15   fraud."  Substantive Opposition, p. 96; Dckt. 86.

16        In both of these conclusions, Defendant-Sinclair clearly argues that final judgments are not

17   final – so long as Defendant-Sinclair asserts they are based on fraud.  As discussed in this

18   Memorandum Opinion and Decision, though having years to attack such judgments in the courts

19   where the judgments or orders were issued, Defendant-Sinclair has chosen not to do so.  Rather, he

20   continues to try and induce this court into violating the Constitution and federal Full Faith and Credit

21   statute by ignoring final judgments.  Further, he tries to get this court to "reach out and slap" state

22   court judges and a district court judge who entered orders, judgments, or decisions against

23   Defendant-Sinclair – just because Defendant-Sinclair so demands.  The impropriety of such

24   collateral attacks is well known to Defendant-Sinclair, this court having explained in detail several

25   times.

26        On this point the court concludes that it is not that Defendant-Sinclair does not understand

27   what he demands is improper, but that this is just another act by Defendant-Sinclair in doing and

28   alleging whatever he thinks is to his benefit without regard to the facts or law.  It is part of his

continuing scheme to inflict willful and malicious injury on his opponents. (Discussed *infra*.)

Taken at face value, Defendant-Sinclair's argument is that FHOA could never engage any attorney to represent it against Defendant-Sinclair. For this proposition, Defendant-Sinclair provides a long string of citations in his Supplemental Substantive Opposition. Dckt. 96. One authority cited is *Responsible Citizens v. Superior Court*, 16 Cal. App. 4th 1717 (1993). The Court of Appeal held:

> [a]n attorney representing a partnership does not necessarily have an attorney-client relationship with an individual partner for purposes of applying the conflict of interest rules. Whether such a relationship exists turns on finding an agreement, express or implied, that the attorney also represents the partner.

*Id.*, Dckt. 1721.

The DCA found the above statement of California law consistent with the then in effect State Bar Rules of Professional Conduct which limited representation against a former client only when there was confidential information obtained from the former client. For two current clients, an attorney cannot represent one against the other. *Id.*, 1724.

The DCA addressed established law that an attorney representing a partnership does not necessarily represent the individual partners. The same is true in representing a corporation, in which the attorney does not necessarily represent the shareholders. *Id.*

Another case cited to the court by Defendant-Sinclair is *Johnson v. Superior Court*, 38 Cal. App. 4th 462 (1995) for the proposition that the attorney for FHOA is also the attorney for every person who owns such property included in the homeowners association. Contrary to Defendant-Sinclair's assertion, consistent with the decision in *Responsible Citizen*, the DCA concluded that when an attorney represents an organization, it is the organization that it the client, not the officers or members. *Johnson v. Superior Court*, 38 Cal. App. 4th at 477.[10]

Nothing substantive has been submitted by Defendant-Sinclair to provide an inkling that

---

[10] Though citing 13 cases in this one section of the Supplemental Substantive Opposition, Defendant-Sinclair does not cite the California Supreme Court decision in *Kapelus v. State Bar*, 44 Cal. 3d 179, 195 (1987), holding that merely because the attorney (who was the general partner of the partnership) was representing the general partnership, that did not create an attorney-client relationship with the limited partners.

there was an attorney-client relationship between Defendant-Sinclair and counsel for Katakis
Plaintiffs.  To the contrary, the relationship appears to have been, and continues to be, contentious
and hostile from day one.  Second, there is no evidence of any agreement to, or representation of,
Defendant-Sinclair. Here, Defendant-Sinclair offers no evidence that current counsel for Katakis
Plaintiffs was undertaking any representation of Defendant-Sinclair.

The court concludes that the contention of a conflict, at this late date, after the entry of the
Final State Court Judgment, the State Court denying such contention in the State Court Action, and
the DCA having determined that such contention did not have merit on the appeal as stated in the
DCA Opinion, does not have merit in this Adversary Proceeding.  This further demonstrates
Defendant-Sinclair's intentional litigation strategy of arguing anything and everything regardless
of merit, even to the point of ignoring the U.S. Constitution and federal statutes requiring that this
court give Full Faith and Credit to final judgments of state courts.

**Exhibit to Supplemental Substantive Opposition**
**Declaration, Proposed Fourth Amended Cross-Complaint**

The court does not find any more reasonable or meritorious now, than previously, Defendant-
Sinclair's contentions with respect to the proposed Fourth Amended Complaint and the numerous
claims he now wants to assert against the Katakis Plaintiffs.  Clearly Defendant-Sinclair's wife and
Dr. Machado (sister who serves as the trustee of Defendant-Sinclair's purported irrevocable trust
and managing member of the limited liability companies) who received the pre-petition transfers of
property from Defendant-Sinclair,  did not find the contentions of Defendant-Sinclair of such great
value to be credible.  Though given the opportunity to "buy" (using the property transferred to them
by Defendant-Sinclair before the filing of the Bankruptcy Case) what Defendant-Sinclair argues is
more than a $40 Million set of claims, neither Defendant-Sinclair's wife nor Dr. Machado thought
the claims were worth the $40,000.00 right of first refusal price.

Far from ignoring these asserted claims, the court reviewed them carefully and was satisfied
that settlement of the claims was proper before granting the Trustee's motion.  The court does not
approve a settlement merely because a trustee asks for it, no more than the court denies such a
motion because a debtor appears to argue claims worth tens of millions of dollars that are decades

40

old have materialized out of thin air.

**Reply By Katakis Plaintiffs**

The court has previously addressed Katakis Plaintiffs' objection to the Opposition based on it being untimely filed. That objection has been overruled. The substantive Reply focuses on Defendant-Sinclair's Opposition being an attempt to relitigate the Final State Court Judgment and collaterally attack said judgment. The court does not need to restate and summarize in detail the Reply in this Ruling.

# PART III

### DOCTRINE OF COLLATERAL ESTOPPEL:
### FINDINGS AND DETERMINATIONS MADE IN
### (1) THE STATE COURT ACTION AND (2) STATE BAR COURT ACTION
### AND
### MATERIAL FACTS DETERMINED NOT IN GENUINE DISPUTE
### (Fed. R. Civ. P. 56(a), (g) and 7056)

**Application of Collateral Estoppel to Findings in State Court Action**

In describing the five elements for Collateral estoppel under California law, the Ninth Circuit Court of Appeals has stated,

> Under California law, collateral estoppel only applies if certain threshold requirements are met:
>
> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1245 (9th Cir. 2001).

*Cal-Micro, Inc. v. Cantrell*, 329 F.3d 1119, 1123 (9th Cir. 2003). The party asserting collateral estoppel bears the burden of establishing these requirements. *In re Harmon*, 250 F.3d 1240, 1245 (9th Cir. 2001). As stated by the court in *Harmon*,

> Under the Full Faith and Credit Act, 28 U.S.C. § 1738, the preclusive effect of a state court judgment in a subsequent bankruptcy proceeding is determined by the preclusion law of the state in which the judgment was issued. *Gayden v. Nourbakhsh (In re Nourbakhsh)*, 67 F.3d 798, 800 (9th Cir. 1995) (citing *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, 84 L. Ed. 2d 274, 105 S. Ct. 1327 (1985)).

*Id.* at 1245. The application of collateral estoppel is greater than merely for the convenience of the

1  federal  court, but is required of the federal courts to respect and give effect to a final state court

2  judgment.

3      The party "asserting collateral estoppel carries the burden of proving a record sufficient to

4  reveal the controlling facts and pinpoint the exact issues litigated in the prior action." *In re Lambert*,

5  233 Fed. Appx. 598, 599 (9th Cir. 2007).  If the court has a reasonable doubt as to what was actually

6  decided by the prior judgment, it will refuse to apply preclusive effect. *Id.*

7      The California Supreme Court discussed the doctrine of collateral estoppel in *Murray v.*

8  *Alaska Airlines, Inc.*, 50 Cal. 4th 860, 879 (2010), stating:

9

10  > We find that the public policies underlying the doctrine of collateral estoppel will
   > best be served by applying the doctrine to the particular factual setting of this case.
   > Those policies include conserving judicial resources and promoting judicial economy

11  > by minimizing repetitive litigation, preventing inconsistent judgments which
   > undermine the integrity of the judicial system, and avoiding the harassment of parties

12  > through repeated litigation. (*Allen v. McCurry* (1980) 449 U.S. 90, 94; *Montana v.*
   > *United States* (1979) 440 U.S. 147, 153–154; *Sims*, *supra*, 32 Cal.3d at pp. 488–489;

13  > *Syufy Enterprises v. City of Oakland* (2002) 104 Cal.App.4th 869, 878.)

14  The Supreme Court's comments ring eerily true for the Motion for Summary Judgment before this

15  court.  Repeatedly Defendant-Sinclair attacks the Final State Court Judgment, asserts he wants to

16  relitigate that final judgment, contends that the final judgment should not be effective, and demands

17  that the final judgment should be ignored – in large part because Defendant-Sinclair disagrees with

18  it, even after the Final State Court Judgment has been affirmed on appeal.  For Defendant-Sinclair

19  the State Court Action, the 36-day trial, the State Court Decision, the Final State Court Judgment,

20  and the Final State Court Judgment being affirmed on appeal are merely rehearsals for future

21  relitigation of the same issues.

22
   **Application of Collateral Estoppel to State Bar Decision**
23  **and Disbarment Order of the Supreme Court**

24      While providing this court with a copy of the State Bar Court Decision, Katakis Plaintiffs

25  have not presented the court with authority whether the State Bar Court Decision is a "previous

26  proceeding" for which the California Superior Court will give collateral estoppel effect.  In *Murray*

27  *v. Alaska Airlines*, 50 Cal. 4th at 878-79, the California Supreme Court also addressed the

28  application of collateral estoppel to an administrative proceeding decision which the party again

1   whom the determination was made could elect to assert his rights rather than commencing an action

2   in the state or federal court.  The California Supreme Court addressed this issue earlier in

3   *Brosterhous v. State Bar*, 12 Cal. 4th 315, 324 (1995), stating:

4           This court has indicated that a final decision in an administrative adjudication may
            be given *res judicata* or collateral estoppel effect in a subsequent judicial proceeding
5           if the issues were identical in the administrative proceeding. ( *People v. Sims* (1982)
            32 Cal. 3d 468, 485.) It may do so if the agency was acting in a judicial capacity and
6           resolved disputed issues of fact which the parties had adequate opportunity to
            litigate. ( *Id.* at p. 479). CA(1a)(1c).

7

8   As further discussed by the California District Court of Appeal in *County of Los Angeles v. Southern*

9   *California Edison, Co*., 112 Cal App. 4th 1108, 1121 (2003) (emphasis added):

10          A final decision by an administrative agency may be given collateral estoppel effect
            in a subsequent judicial action if the agency acted in a judicial capacity and resolved
11          disputed factual issues that the parties had an adequate opportunity to litigate.
            (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 324.) Collateral estoppel applies,
12          however, only **if the present issue is identical to an issue decided in a prior
            proceeding**. (*Ibid.*; *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341–342 [stating
13          further, "The 'identical issue' requirement addresses whether 'identical factual
            allegations' are at stake in the two proceedings, not whether the ultimate issues or
14          dispositions are the same. [Citation.]"].)

15          California Business and Professions Code § 6084 provides that the decision of the State Bar

16  Court becomes final and enforceable if no petition to review, reverse, or modify is timely filed with

17  the California Supreme Court.

18          The California Supreme Court, upon consideration of the State Bar Court Decision and the

19  findings of the judge in that previous proceeding, issued its Opinion ordering that Defendant-Sinclair

20  is disbarred from the practice of law in the State of California.  *Sinclair on Discipline*, Cal. Supreme

21  Court No. S230942,  2016 Cal. LEXIS 3065 (Feb. 7, 2016).

22          This court will also consider the findings of the State Bar Court for the application of the

23  doctrine of collateral estoppel as it applies to the issues presented to the court.  To minimize

24  confusion for the parties (as well on any potential appeal), the court will first consider the State

25  Court Decision and Final State Court Judgment for the application of collateral estoppel and whether

26  the Final State Court Judgment alone provides grounds for the summary judgment requested, or in

27  the alternative the material facts which are not in genuine dispute.  The court will then consider and

28  determine what additional issues or facts are determined based on collateral estoppel being applied

1  to the State Bar Decision.

2  **Final State Court Judgment and State Court Decision**
   **Findings and Determinations Applicable**
3  **to the Issues in This Adversary Proceeding**

4      Defendant-Sinclair and Katakis Plaintiffs have litigated and previously determined facts in

5  the prior State Court Action that also arise in this Adversary Proceeding.  Applying the four factor

6  test, the court concludes for all findings and determinations in the State Court Decision set forth in

7  Addendum A as follows:

8      First, the facts and determinations presented from the Final State Court Judgment and State

9  Court Decision to be given collateral estoppel effect are those applicable to the determination of

10  nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6).

11      Second, the issues were actually litigated as part of a 36-day trial in the State Court Action.

12      Third, the issues for which collateral estoppel apply were those necessarily and expressly

13  determined by the State Court.

14      Fourth, the Final State Court Judgment is "final" and has been affirmed on appeal.  While

15  Defendant-Sinclair now argues that in 2017 he thinks that the Final State Court Judgment should

16  be attacked, it has not been during the years preceding the commencing of the Bankruptcy Case and

17  has not been vacated.

18      Fifth, Defendant-Sinclair was a party in the State Court Action, the issues were determined

19  after the 36-day trial in the State Court Action, and the Final State Court Judgment is binding on

20  Defendant-Sinclair.

21      Therefore, the court adopts and incorporates herein all of the determinations made in the

22  State Court Decision stated in Addendum A attached hereto.

23      To avoid confusion in light of the roles being reversed in the State Court Action, with

24  Defendant-Sinclair being the plaintiff and Katakis Plaintiffs being the defendant, the court

25  substitutes the defined terms for these parties in this decision for the references to persons in the

26  State Court  Decision and judgment in the findings and determinations adopted in Addendum A.

27  When the State Court judge made a finding expressly as to only the Defendant-Sinclair, it has

28  identified him as "Mr. Sinclair."  The court has retained the State Court's reference to Mr. Sinclair

1  individually in citing to the State Court Decision.

2        The findings and determinations made in the State Court Action given collateral estoppel

3  effect in this Adversary Proceeding and determined not to be in material dispute pursuant to Federal

4  Rule of Civil Procedure 56(g) and Federal Rule of Bankruptcy Procedure 7056 are set forth in

5  Addendum A attached hereto, with the actual language of the specific findings and determinations

6  of the State Court set forth in using double quotation marks (" . . . ").

7

8                    **State Bar Decision Findings and Determinations**
                **Applicable to the Issues in This Adversary Proceeding**

9        In the State Bar Court Decision, the findings and determinations have been made in that

10  proceeding in which Defendant-Sinclair was a party.  The State Bar Court judge stated that with

11  respect to the Fox Hollow Property matter before the State Bar Court, while many of the findings

12  were made by the trial and appellate court in State Court Action, "this [State Bar] court, nonetheless,

13  must assess them independently under the more stringent standard of proof applicable to disciplinary

14  proceedings. (*Maltaman v. State Bar* (1987) 43 Cal.3d 924, 947.)"  Further, the State Bar Court's

15  findings were made under the "clear and convincing" evidence standard, not the lower

16  preponderance of the evidence standard in civil court proceedings.[11]

17        This court determines that the findings and conclusions in the State Bar Court Decision were

18  actually determined as part of the litigation in which Defendant-Sinclair was a party.  Further, all

19  of the determinations made  in the State Bar Court Decision set forth in Addendum B hereto: (1) are

20  identical to the grounds asserted in this Motion for Summary Judgment as the basis for the relief

21  requested here; (2) they were actually litigated in the State Bar Court Action; (3) they were

22  necessarily determined in the State Bar Court Action; and (4) such issues determined are being

23  asserted in this Adversary Proceeding against the Defendant-Sinclair, who is the party against whom

24  such determinations were made in the State Bar Court Action.

25        To avoid confusion the court substitutes the defined terms for these parties in this decision

26  for the references to persons in the State Bar Court Decision adopted in Addendum B.

27

28

      [11]  Exhibit 12, State Bar Court Decision, p. 3; Dckt. 79.

1　The findings and determinations made in the State Bar Court Decision given collateral

2　estoppel effect in this Adversary Proceeding and determined not to be in material dispute pursuant

3　to Federal Rule of Civil Procedure 56(g) and Federal Rule of Bankruptcy Procedure 7056 are set

4　forth in Addendum B hereto, with the actual language of the specific findings and determinations

5　of the State Court set forth in using double quotation marks (" . . . ").

**APPLICABLE LAW TO DETERMINATION OF THE**
**MOTION FOR SUMMARY JUDGMENT**
**OR IN THE ALTERNATIVE DETERMINATION OF FACTS**
**NOT GENUINELY IN MATERIAL DISPUTE**

9　In an adversary proceeding, summary judgment is proper when "[t]he movant shows that

10　there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

11　of law." Fed. R. Civ. P. 56(a), *incorporated by* Fed. R. Bankr. P. 7056. The key inquiry in a motion

12　for summary judgment is whether a genuine issue of material fact remains for trial. Fed. R. Civ. P.

13　56(c), *incorporated by* Fed. R. Bankr. P. 7056; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

14　248-50 (1986); 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.11[1][b] (3d ed.

15　2000). "[A dispute] is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable

16　fact finder could find for the nonmoving party, and a dispute [over a fact] is 'material' only if it

17　could affect the outcome of the suit under the governing law." *Barboza v. New Form, Inc. (In re*

18　*Barboza*), 545 F.3d 702, 707 (9th Cir. 2008), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

19　248 (1986).

20　The party moving for summary judgment bears the burden of showing the absence of a

21　genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To support the

22　assertion that a fact cannot be genuinely disputed, the moving party must "cit[e] to particular parts

23　of materials in the record, including depositions, documents, electronically stored information,

24　affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."

25　Fed. R. Civ. P. 56(c)(1)(A), *incorporated by* Fed. R. Bankr. P. 7056.

26　In response to a sufficiently supported motion for summary judgment, the burden shifts to

27　the nonmoving party to set forth specific facts showing that there is a genuine dispute for trial.

28　*Barboza*, 545 F.3d at 707, citing *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055–56 (9th Cir.

46

1   2002). The nonmoving party cannot rely on allegations or denials in the pleadings but must produce

2   specific evidence, through affidavits or admissible discovery materials, to show that a dispute exists.

3   *Id.* (*citing Bhan v. NME Hosps., Inc*., 929 F.2d 1404, 1409 (9th Cir. 1991)). The nonmoving party

4   "must do more than simply show that there is some metaphysical doubt as to the material facts."

5   *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

6         In ruling on a summary judgment motion, the court must view all of the evidence in the light

7   most favorable to the nonmoving party. *Barboza*, 545 F.3d at 707 (*citing County. of Tuolumne v.*

8   *Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001)). The court "generally cannot grant

9   summary judgment based on its assessment of the credibility of the evidence presented." *Agosto v.*

10  *INS*, 436 U.S. 748, 756 (1978). "[A]t the summary judgment stage[,] the judge's function is not

11  himself to weigh the evidence and determine the truth of the matter[,] but to determine whether there

12  is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

13  **Evidence Presented in Support of Motion for Summary Judgment**

14        All of the evidence presented in support of the Motion for Summary Judgment, with minor

15  exception, are in the form of the State Court Decision upon which the Final State Court Judgment

16  was issued and affirmed on appeal.  Defendant-Sinclair counters not with evidence, but with

17  arguments (whether in the oppositions or placed in his declarations) and his contentions that the

18  State Court Action was not fair, that he was disabled, and that he has other matters he wants to

19  litigate, and that this makes the Final State Court Judgment something other than a final judgment

20  of the California courts.  While arguing, or testifying to such contentions, Defendant-Sinclair fails

21  to provide the court with evidence to counterbalance the effect of the Final State Court Judgment

22  and the State Court Decision, which has been affirmed on appeal, and the State Bar Court Decision.

23  ///

24  ///

25  ///

26  ///

27

28

47

# PART IV

**DETERMINATION THAT MOTION IS DENIED WITHOUT PREJUDICE FOR 11
U.S.C. § 523(a)(2)(A) RELIEF
AND
GRANTING RELIEF PURSUANT TO 11 U.S.C. § 523(A)(6)**

Katakis Plaintiffs seek relief on two separate and independent legal theories, though both are based on the same set of operative, overlapping facts.  The amount of damage arising from the alleged fraud and willful and malicious injury is asserted to be obligation of Defendant-Sinclair on the judgment for $1,066,530.52 in attorneys' fees and costs awarded Katakis Plaintiffs for the State Court Action and appeal thereof.  The Complaint seeks a judgment determining that the Final State Court Judgment and obligation owing thereon are nondischargeable, and not the entry of a new monetary federal judgment.  If determined nondischargeable, then the Final State Court Judgment may continue to be enforced through the State Court Action, not this court, to the extent determined nondischargeable.

**11 U.S.C. § 523(a)(2)(A) Grounds for Nondischargeability of Debt**

The first basis for asserting that the obligations owed to Katakis Plaintiffs on the Final State Court Judgment (the award of attorneys' fees at trial and on appeal) are nondischargeable is a contention that the obligation is for "money, property, services, or an extension, renewal, or refinancing of credit" obtained by fraud.  The statutory basis for such a contention is found in 11 U.S.C. § 523(a)(2)(A), which states as follows:

11 U.S.C. § 523(a)(2)(A)

§ 523.  Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

The Ninth Circuit Court of Appeals explained the application of 11 U.S.C. § 523(a)(2)(A) in *Turtle Rock Meadows Homeowners Ass'n v. Slyman* (*In re Slyman*), 234 F.3d 1081, 1085 (9th Cir. 2000),

1   as (emphasis added):

2          Under §523(a)(2)(A) of the Bankruptcy Code, a debt for services obtained
    by the debtor under "false pretenses, a false representation, or actual fraud" is
3   nondischargeable.   11 U.S.C. §523(a)(2)(A)  (2000). "**The purposes of this
    provision are to prevent a debtor from retaining the benefits of property
4   obtained by fraudulent** means and to ensure that the relief intended for honest
    debtors does not go to dishonest debtors." 4 Collier on Bankruptcy Par. 523.08[1][a]
5   (15th ed. rev. 2000).

6          The ruling in *Turtle Rock* harkens back to the Supreme Court's unanimous decision authored

7   by Justice Sandra Day O'Connor in *Cohen v. De La Cruz*, 523 U.S. 213, 217-219 (1998) (emphasis

8   added), which states:

9
           The Bankruptcy Code has long prohibited debtors from discharging liabilities
10  incurred on account of their fraud, embodying a basic policy animating the Code of
    affording relief only to an "**honest but unfortunate debtor**." *Grogan v. Garner*,
11  supra, at 287  (internal quotation marks omitted); see id., at 290; *Brown v. Felsen*,
    442 U.S. 127, 138, 60 L. Ed. 2d 767, 99 S. Ct. 2205 (1979). Section 523(a)(2)(A)
12  continues the tradition, excepting from discharge "any debt . . . for money, property,
    services,  or an extension, renewal, or refinancing of credit, to the extent obtained by
13  . . . false pretenses, a false representation, or actual fraud."

14         The most **straightforward reading of § 523(a)(2)(A)** is that it **prevents discharge**
    of **"any debt" respecting "money, property, services, or . . . credit"** that the
15  debtor has **fraudulently obtained**, including treble damages assessed on account of
    the fraud. See *Field v. Mans*, 516 U.S. 59, 61, 64, 133 L. Ed. 2d 351, 116 S. Ct. 437
16  (1995) (describing § 523(a)(2)(A) as barring discharge of debts "resulting from" or
    "traceable to" fraud). . . .

17
           Moreover, the phrase "to the extent obtained by" in § 523(a)(2)(A), . . . makes clear
18  that **the share of money, property, etc., that is obtained by fraud gives rise to a
    nondischargeable debt** . . . [and] . . . "any debt" arising therefrom is excepted from
19  discharge**. . . .**

20         The application of 11 U.S.C. § 523(a)(2)(A) has been the subject of a recent Supreme Court

21  decision in *Husky International Electronics, Inc. v. Ritz*, ___ U.S. ___, 136 S. Ct. 1581 (2016).

22  Katakis Plaintiffs assert that the decision in *Husky* renders Defendant-Sinclair's larger scheme to

23  defraud other persons in connection with the Fox Hollow Property a sufficient "fraud" on the

24  Katakis Plaintiffs to render the obligation on the Final State Court Judgment nondischargeable for

25  fraud.

26         Katakis Plaintiffs contend that based on the conclusion of the Supreme Court in *Husky* that

27  an affirmative misrepresentation need not be made to the creditor, but that Defendant-Sinclair's

28  scheme being sufficiently akin to a fraudulent conveyance scheme (for which liability would exist

to such creditor would exist) to drain assets from one entity to avoid those assets being paid to creditors of that entity renders nondischargeable the obligation to Katakis Plaintiffs for attorneys' fees. While broadening the scope of actual fraud under 11 U.S.C. § 523(a)(2)(A), Katakis Plaintiffs overextend *Husky* and ignore key portions of that decision and the statute.

The facts of *Husky* can be summarized as follows: (1) Husky sold goods during the period 2003 to 2007 on credit to a corporation controlled by Ritz; (2) Beginning in 2006 and continuing in 2007, Ritz began transferring large sums of money from the corporation to another entity in which Ritz had an interest; (3) The corporation was unable to pay creditors; (4) The transfers of assets were fraudulent conveyances made to evade the corporation paying its creditors, and (5) Ritz was personally liable to Husky for the transfers of the corporation's assets as a matter of Texas law. The bankruptcy court, district court, and Fifth Circuit Court of Appeals concluded that while fraudulent conveyances had occurred, there was not the requisite "misrepresentation" made by Ritz to Husky to constitute "actual fraud" under 11 U.S.C. § 523(a)(2)(A).

The Supreme Court disagreed, stating that the definition of the term "actual fraud" was not limited to only the good old fashion "five finger fraud" (with the "first couple fingers" being the knowing, intentional misrepresentation made directly to the creditor, upon which the creditor justifiably relied) but encompassed broader fraudulent conduct. In reality, as discussed below, this is not inconsistent with the long-standing definition of "actual fraud" for purposes of 11 U.S.C. § 523(a)(2)(A) in the Ninth Circuit, with the "first finger" being "misrepresentation, fraudulent omission **or deceptive conduct by the debtor**." See elements as stated in *Turtle Rock Meadows Homeowners Ass'n v. Slyman* above.

The Supreme Court did not flush away that the creditor must have a claim for "actual fraud" under 11 U.S.C. § 523(a)(2)(A), but recognized that "actual fraud" can be done in a matter in which there is not a specific, express misrepresentation made as part of the "deceptive conduct." The discussion of this principle by the Supreme Court illuminating what constitutes "actual fraud," beyond the express misstatement made directly to the creditor, includes:

> But the historical meaning of "actual fraud" provides even stronger evidence that the phrase has long encompassed the kind of conduct alleged to have occurred here: a transfer scheme designed to hinder the collection of debt.

*Husky Intl. Elec. Inc. v. Ritz*, 136 S. Ct. at 1586.  Further,

> "Actual fraud" has two parts: actual and fraud . . .  Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Id.*  The fraud found in "fraudulent conveyance" law is a recognized actionable actual fraud for which the wrongdoer is held accountable for which there does not need to be a "misrepresentation" which induces conduct of the injured party.  While not an "inducement fraud," the actual fraud in a fraudulent conveyance claim is one of concealment and hindrance, with the fraud being the non-disclosure of the truth, not the disclosure of a non-truth.  *Id.*

In rejecting the dissent's assertion that the fraud must be at the inception of the transaction (a misrepresentation to obtain the credit), the majority in *Husky* concludes that no such requirement exists for actual fraud, distinguishing *Field v. Mans, 516 U.S. 59, 69, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995)*.  *Id.* at 1589-1590.

Katakis Plaintiffs are correct, to the extent that they state that the Supreme Court has made it clear that "actual fraud" includes fraudulent conduct intentionally done by a debtor, and one does not have to find a specific misrepresentation by the Defendant-Sinclair.  But the Supreme Court also held that merely because Ritz had engaged in the fraudulent transfers and that Ritz was obligated to Husky because of the fraudulent conduct, that did not automatically result in the debt being nondischargeable.  The only determination was that "actual fraud" included a fraudulent transfer in which Ritz [the bankruptcy debtor] intentionally engaged in regarding the assets of the corporation that was obligated to Husky.  As noted in Footnote 3 to the *Husky* Decision:

> Ritz' situation may be unusual in this regard because Husky contends that Ritz was both the transferor and the transferee in his fraudulent conveyance scheme, having transferred Chrysalis assets to other companies he controlled. We take no position on that contention here and leave it to the Fifth Circuit to decide on remand **whether the debt to Husky was "obtained by" Ritz' asset-transfer scheme**.

*Id.* at 1589 (emphasis added).  The "fact" that there was a "fraudulent scheme," and one does not have to point to a specific "fraudulent misrepresentation," does not erase the other requirement of 11 U.S.C. § 523(a)(2)(A) that the debtor must be for "money, property, services, or an extension, renewal, or refinancing of credit, **to the extent obtained**" by the actual fraud.

Katakis Plaintiffs, for purposes of the present Motion for Summary Judgment, have failed

51

1    to show that they have been the victims of fraud or that they have a claim based on fraud, as that

2    term is used in 11 U.S.C. § 523(a)(2)(A).  Rather, the mere showing that Defendant-Sinclair may

3    have misrepresented facts to other persons, may have misrepresented facts to the public by recording

4    documents knowing that they were not proper, and made misrepresentation to lenders does not

5    equate to actual fraud having been committed on the Katakis Plaintiffs.

6           Further, Katakis Plaintiffs have not shown that Defendant-Sinclair's obligation to pay them

7    for the attorneys' fees and costs that Katakis Plaintiffs have paid or owe to their own attorneys is

8    "money, property, services, or an extension, renewal, or refinancing of credit" obtained by

9    Defendant-Sinclair from Katakis Plaintiffs.

10          In reality, Katakis Plaintiffs argue that morally Defendant-Sinclair is a bad man, has engaged

11   in fraudulent conduct as to others, and on a general moral basis should not be allowed to discharge

12   the obligation owed to Katakis Plaintiffs by Defendant-Sinclair.  That is not the standard for

13   nondischargeable fraud.  Katakis Plaintiffs must show actual fraud, as to them, and that the

14   obligation owed to them by Defendant-Sinclair is for money, property, services, or an extension,

15   renewal, or refinancing of credit, to the extent obtained by the actual fraud.

16          By the time Katakis Plaintiffs were purchasing the lots, Defendant-Sinclair's fraud on others

17   was known.  As shown in the findings set forth in both the State Court Decision and the State Bar

18   Court Decision, Defendant-Sinclair even attempted to profit from his misconduct and

19   misrepresentations to others by purchasing the lots from the lenders at a substantial discount.

20          While Katakis Plaintiffs have shown that Defendant-Sinclair's conduct has caused them

21   damages, the  attorneys' fees and costs awarded, Katakis Plaintiffs have failed, for purposes of this

22   Motion for Summary Judgment, to show that their claim is nondischargeable based on fraud under

23   11 U.S.C. § 523(a)(2)(A).  That claim for relief  shall proceed to trial.

24              **11 U.S.C. § 523(a)(6)(A) Grounds for Nondischargeability of Debt**

25          As a second and separate basis for determination that the obligations owing for the attorneys'

26   fees and costs awarded as part of the Final State Court Judgment and the appeal thereof are

27   nondischargeable, Katakis Plaintiffs assert that the damages flow from the willful and malicious

28   inflicted on them by Defendant-Sinclair.  This ground is stated by Congress in 11 U.S.C.

§ 523(a)(6).

11 U.S.C. § 523(a)(6)

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

  (6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . . .

In *Ormsby v. First American Title Co. (In re Ormsby)*, 591 F.3d 1199 (9th Cir. 2010), the Ninth Circuit Court of Appeal explains the dual requirement for a determination of an injury to have been the result of "willful and malicious" conduct.

  The Supreme Court in *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998), made clear that for section 523(a)(6) to apply, the actor must intend the consequences of the act, not simply the act itself. *Id.* at 60. Both willfulness and maliciousness must be proven to block discharge under section 523(a)(6).

  In this Circuit, "§ 523(a)(6)'s willful injury requirement is met only when the debtor has a **subjective motive to inflict injury** or when the **debtor believes that injury is substantially certain to result from his own conduct**." *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002). The Debtor is charged with the knowledge of the natural consequences of his actions. *Cablevision Sys. Corp. v. Cohen (In re Cohen)*, 121 B.R. 267, 271 (Bankr. E.D.N.Y. 1990); see *Su*, 290 F.3d at 1146 ("In addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action.").
  . . .
  "A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001) (internal citations omitted). Malice may be inferred based on the nature of the wrongful act. See *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 554 (9th Cir. 1991). 7 To infer malice, however, it must first be established that the conversion was willful. See *Thiara*, 285 B.R. at 434.

*Ormsby v. First Am. Title Co.*, 591 F.3d at 1206-1207 (emphasis added).

**The $1,066,530.52 Final State Court Judgment is Nondischargeable Pursuant to 11 U.S.C. § 523(a)(6) – Final State Court Judgment and State Court Decision**

The court begins with the findings and determinations in the State Court Decision in considering whether the conduct of Defendant-Sinclair resulting in the now $1,066,530.52 Final State Court Judgment rises to willful and malicious conduct. This court concludes that the commencement and prosecution of the action against Katakis Plaintiffs was part of the larger intentional and willful acts as part of Defendant-Sinclair's plans and schemes for obtaining,

1    maintaining, taking, or obtaining benefit from the Fox Hollow Property.

2          Though stated at the end of the State Court Decision, the State Court determined that

3    Defendant-Sinclair, Mauctrst LLC, Lairtrust LLC, Capstone LLC, Capstone Trust, Stan Flake,

4    Brandon Sinclair, and Gregory Mauchley, the other plaintiffs in the State Court Action ("Other State

5    Court Action Plaintiffs") with Defendant-Sinclair are indistinguishable from one another for the

6    purposes of the doctrine of unclean hands as Defendant-Sinclair was acting for them.  State Court

7    Decision, ¶ 28 at 23:22.5-24.5.[12]  Further, Mauctrst was a sham and alter-ego for Defendant-Sinclair

8    and Mr. Mauchley.  *Id.*

9          Defendant-Sinclair promoted the development of real property in the City of Turlock,

10   California, which is identified as the "Fox Hollow Property."  In doing so, in April 1994, Defendant-

11   Sinclair misrepresented in writing to the City of Turlock that the FHOA was sufficiently funded.

12   *Id.*,  ¶ 1 at 6:13.5 to 16.5.  No FHOA had been established, and the statement that a homeowners

13   association existed and was funded was a false statement to the City of Turlock.  *Id.*

14         During the period of November 1995 through February 1997, Defendant-Sinclair worked

15   with Stanley Flake to develop the Fox Hollow Property.  *Id.*, ¶ 2 at 6:17.5-19.  At trial, Mr. Flake

16   testified he was not involved in working to develop the Fox Hollow Property with the Defendant-

17   Sinclair.  The State Court Decision determined that Mr. Flake's testimony was false.  *Id.,* and at

18   4:4.5-10.5.

19         In March of 1996, the Defendant-Sinclair, working with the Other State Court Action

20   Plaintiffs, recorded a subdivision map for the Fox Hollow Property.  A condition of recording

21   Subdivision Map No. 1 was that the FHOA be formed.  In addition to recording the subdivision map,

22   Defendant-Sinclair recorded the covenants, conditions and restrictions ("CC&Rs") for the Fox

23   Hollow Property, which CC&Rs required the formation of an FHOA.  Defendant-Sinclair failed to

24   form the FHOA, notwithstanding the recording of documents for which the FHOA was a condition

25   precedent.  *Id.*, ¶ 3 at 6:20-22.

26         In February 1997, four lots of the Fox Hollow Property were transferred from Stanley Flake

27

28         [12]  When the citation is to a numbered paragraph in the State Court Decision, this court includes
     the "¶" number in addition to the page and line numbers.

                                        54

1  to Mr. Mauchley.  Id., ¶ 4 at 6:22.5-24.  Then in 1998, Defendant-Sinclair worked to secure
2  financing for the Fox Hollow Property, using the Fox Hollow Property as collateral.  *Id.*, ¶ 5 at 6:25-
3  26.

4      On or about July 21, 1998, Defendant-Sinclair and the Other State Court Action Plaintiffs
5  recorded a second subdivision map ("Subdivision Map No. 2") to create 15 new lots on the Fox
6  Hollow Property.  Defendant-Sinclair recorded Subdivision Map No. 2 with the knowledge that he
7  had not complied with the requirements as a condition precedent to recording the map.  This
8  misconduct included not only that the FHOA which had not been formed, but also the failure to have
9  the required work completed on the Fox Hollow Property that was a condition precedent to the
10  recording of Subdivision Map No. 2.  *Id.*, ¶ 6 at 6:27.5-28, 7:1-2.5.

11      Upon recording Subdivision Map No. 2, Defendant-Sinclair arranged 15 loans for which
12  deeds of trust were recorded against the 15 lots created in the new Subdivision No. 2 by the
13  recording of Subdivision Map No. 2.  The deeds of trust were signed by Mr. Mauchley which
14  contained representations that the FHOA was in existence.  However, Defendant-Sinclair had not
15  formed the FHOA. *Id.*, ¶ 7 at 7:3.5-5.

16      The loans arranged by Defendant-Sinclair in July of 1998 were based on values for the
17  15 lots with completion of subdivision firewall and relocation of underground utilities for
18  15 different ownerships of the lots created by Subdivision Map No. 2.  This information provided
19  by Defendant-Sinclair to the lenders was false. *Id.*, ¶ 8 at 7:6-8.

20      By late 1998 and early 1999, defaults began occurring on the loans arranged by Defendant-
21  Sinclair in July 1998.  Defendant-Sinclair then further encumbered the Fox Hollow Property with
22  an additional $300,000.00 of debt.  When Mr. Mauchley communicated with Defendant-Sinclair
23  about defaults in payments, Defendant-Sinclair stated that the payments had been made by wire
24  transfers or other payment.  This was false, and Defendant-Sinclair later recanted this explanation
25  given to Mr. Mauchley. *Id.*, ¶ 9 at 7:9-11.

26      In the April to June 1999 period, the lenders began recording notices of defaults for the loans
27  obtained by Defendant-Sinclair in July 1988 on the 15 lots created by Subdivision Map No. 2.  Then,
28  on July 1, 1999, an entity name "Mauctrst LLC" filed bankruptcy.  Mauctrst asserted it was the

1    owner of the 15 lots created by Subdivision Map No. 2 and that the bankruptcy automatic stay

2    prevented the creditors holding the notes and deeds of trust from the July 1998 loans from

3    foreclosing. *Id.*, ¶ 10 at 7:12-14.

4          In July of 1999, it was represented that Mauctrst LLC was owned 50% by Mrs. Mauchley

5    and 50% by Mr. Mauchley.[13]   At the State Court Trial Mr. Mauchley testified that such statements

6    were false.  In unlawful detainer proceedings both Defendant-Sinclair and Mr. Mauchley stated

7    under penalty of perjury that the two of them owned the Fox Hollow Property. *Id.*, ¶ 11 at 7:15-19.

8          The State Court determined that Defendant-Sinclair testified in deposition, testified at trial,

9    and stated in letters that he sent, that at the time that Defendant-Sinclair was a "member/manager"

10   of Mauctrst LLC and that "member/manager" meant "owner."  Further, Defendant-Sinclair

11   financially benefitted having received $160,000.00 from the Fox Hollow Property endeavor in the

12   year before July 1, 1999. *Id.*, ¶ 12 at 7:20-22.5.

13         In January 2000, Defendant-Sinclair began to attempt to negotiate significant discounts on

14   the loans by drawing the lenders' attention -- 18 months after Defendant-Sinclair arranged the loans

15   -- to the fact that their collateral was impaired for reasons solely attributable to Defendant-Sinclair's

16   misconduct. *Id.*, ¶ 13 at 7:23.5-25.5.

17         In  February 2000, lenders filed additional notices of default regarding the Fox Hollow

18

19         [13]  The Mauctrst, LLC bankruptcy case was filed on July 1, 1999 in this Court.  The Petition is
20   signed by Gregory V. Mauchley as the "Member - Manager." 99-28903, Dckt. 1.  The Defendant-
     Sinclair signed the Petition as the attorney for Debtor.  *Id.*  Schedule A lists Mauctrst as owning 19 Lots
21   at "152 Twentieth Century Turlock, CA.," encumbered by 19 individual loans and 2 blanket loans
     encumbered by second and third deeds of Trust. Dckt. 70 at 3.  Six other properties are listed on
22   Schedule A, consisting of 5 properties in Ceres, California and one in Fairfield, California.  *Id.* at 4.  On
     the Statement of Financial Affairs, in response to Question 19  to list the name of current partners, officer,
23   directors, and shareholders, the only response is "LLC."  *Id.* at 40.

24         The signature page for the Statement of Financial Affairs is signed "Mauctrst, LLC by Richard
25   Sinclair, Manager."  *Id.* at 42.

26         On December 8, 1999, Amended Schedules were filed Mauctrst, LLC.  Dckt. 150.  On
     Schedule A, no new real properties are listed, but it is stated that Greg Mauchley is listed as having a
27   Blanket 4th Deed of Trust to secure $390,700.00.  *Id.* at 4.

28         On the Amended Statement of Financial Affairs, in response to Question 19 the two members are
     listed as Gregory Mauchley, 50%, and Diana Mauchley, 50%.  *Id.* at 41.

Property. In March 2000, Defendant-Sinclair began suing lenders and seeking restraining orders to delay the foreclosures. In total, Defendant-Sinclair filed seven lawsuits and lost "nearly all of them." *Id.*, ¶ 14 at 7:26.5-28.

On June 6, 2000, Defendant-Sinclair obtained a preliminary injunction relating to Lots 9 and 14 of the Fox Hollow Property. However, Defendant-Sinclair falsely claimed the preliminary injunction also pertained to Lots 3 and 7. The injunction was conditioned on Defendant-Sinclair and the Other State Court Action Plaintiffs making the required monthly payments on the promissory notes as they came due. Defendant-Sinclair and the Other State Court Action Plaintiffs failed to make a single payment, while enjoying the benefit of the injunction until 2003.[14] *Id.*, ¶ 15 at 8:1.5-4.

Defendant-Sinclair prepared FHOA minutes indicating that Mr. Mauchley was present at the first two FHOA meetings. Mr. Mauchley testified that he did not attend meetings. The FHOA minutes indicate work was being done on, and Mr. Sinclair billed Fox Hollow for doing work on, the Articles of Incorporation during the time period of August 2000 to December 2000. However, the Articles of Incorporation were signed and completed in July 2000, and simply not filed with the Secretary of State until December 2000. *Id.*, ¶ 16 at 8:5-8.

In October 2000, Defendant-Sinclair reported to the escrow that outstanding, unpaid dues were owing, and volunteered to the escrow that "title to the lots cannot be transferred at the present time" in connection with any attempted sale. Defendant-Sinclair provided a declaration under penalty of perjury to the State Court that this letter was sent to the escrow "[o]ut of courtesy to the new owners and to elicit their cooperation." The State Court Decision expressly concludes that this testimony by Defendant-Sinclair was not credible. A month later, Defendant-Sinclair sent out a FHOA dues statement with a note at the bottom that there were potential purchasers interested in purchasing the lots at their "as is where is" price. *Id.*, ¶ 17 at 8:9-12.5.

In February 2001, a receiver was appointed over Defendant-Sinclair's objection. The receiver appointment hearing reflects Defendant-Sinclair's misleading conduct. (The State Court Decision makes reference to the record, "1289," but does not state in the findings what the "misleading

---

[14] The Trial Court Decision does not state as part of the findings how or why the creditors allowed this default to continue for more than two years.

conduct" was in the receivership proceeding.) *Id.*, ¶ 18 at 13.5-14.5.

In May 2001, Defendant-Sinclair entered a settlement agreement with GMAC for the sale of the Fox Hollow Property. What Defendant-Sinclair failed to disclose to GMAC was that Defendant-Sinclair secretly set up as a double escrow the Fox Hollow Property, and Defendant-Sinclair as the undisclosed actual purchaser. In July 2001, Defendant-Sinclair failed to close the (secret double) escrow to purchase the Fox Hollow Property pursuant to the settlement with GMAC. Defendant-Sinclair informed Mr. Mauchley that they missed the deadline to complete the (secret double escrow) purchases. Defendant-Sinclair had even written correspondence acknowledging that the escrow to sell the Fox Hollow Property "must close" within the time certain. However, when Defendant-Sinclair failed to close the (secret double) escrow to timely buy the property, he claimed that the date for the close of escrow was not a condition of their agreement with GMAC. *Id.*, ¶ 19 at 8:15.5-19.

In December 2001, Brandon Sinclair (Defendant-Sinclair's son) took out a loan against Lot 1 at Fox Hollow and then transferred the property to an LLC that he and Defendant-Sinclair formed. The purpose stated in Brandon Sinclair's testimony was that the LLC was set up to protect Brandon Sinclair from credit damage when they defaulted. *Id.*, ¶ 20 at 8:20-21.5.

In May 2002, Defendant-Sinclair and the Other State Court Action Plaintiffs stopped making dues payments to the FHOA. *Id.*, ¶ 21 at 8:22.5. In June 2002, more than 10 months after Defendant-Sinclair and the Other State Court Action Plaintiffs were to close escrow on Lots 11 and 18 and after GMAC had canceled the Settlement Agreement with Defendant-Sinclair, California Equity Management Group, Inc. (one of the Plaintiffs in this Adversary Proceeding) entered into a contract with GMAC to purchase those two lots. *Id.*, ¶ 22 at 8:23.5-27.5.

During the State Court Action, Defendant-Sinclair deleted information from an exhibit in an attempt to create the false impression that Defendant-Sinclair and the Other State Court Action Plaintiffs had claimed Defendant-Sinclair had a contract to purchase the properties before GMAC and CEMG completed their sale. The State Court Decision expressly determined that Defendant-Sinclair's testimony regarding what he told Mr. Katakis before CEMG closed escrow was false. *Id.*

On July 31, 2002, Defendant-Sinclair advised the court in which the receivership action was

1  pending in writing that: (a) after that court appointed a receiver, "the Board resigned"; (b) there was

2  "no board of directors to represent" the FHOA; (c) "no direction has been provided"; and

3  (d) elections should be held.  Defendant-Sinclair failed to advise the FHOA for two months after the

4  new Board was elected that Defendant-Sinclair and the prior Board asserted they were still the

5  FHOA Board.  Defendant-Sinclair only did so when it was apparent that the new Board was going

6  to begin collecting dues and gather estimates for the repair work at Fox Hollow.  *Id.*, ¶ 23 at 9:1-

7  10.5.

8     Defendant-Sinclair explained why he told the State Court that the board had resigned, there

9  was not a  board, and he (Defendant-Sinclair as the attorney) was not getting any direction, stating:

10
11     What I must have ineloquently represented to the Court was Mr. Katakis was buying
       us out. He had made us an offer of about $1 million. We were waiting to finalize that.
       And everybody wanted to get rid of this case because it had no other purpose. And
12     so we weren't going to go to trial. We weren't going to go forward with it. And so I
       was telling the Court, you know, this is kind of done with.

13     The State Court Decision found that rather than admit that he had lied to the Court,

14  Defendant-Sinclair made up the above story.  First, the State Court concluded that the document

15  Defendant-Sinclair stated to the Court at trial suggests nothing remotely like Defendant-Sinclair's

16  testimony.  Second, the evidence was unequivocally clear that Mr. Katakis never offered them

17  $1 million to Defendant-Sinclair and the Other State Court Action Plaintiffs as Defendant-Sinclair

18  asserted at the State Court trial.  *Id.*

19     Then, in October 2002, when the new Board and officers were elected for the FHOA, the Fox

20  Hollow Property was already in very poor condition.  It had been in the same condition when the

21  State Court was required to appoint a receiver for the homeowner's association.  It had been in a

22  deteriorating condition since as early as 1993.  Defendant-Sinclair even admitted the deferred

23  maintenance. Yet, Defendant-Sinclair continued to claim that he and the Other State Court Action

24  Plaintiffs had no role in the poor condition of Fox Hollow.  *Id.* , ¶ 24 at 9:11.5-14.5.

25     In December 2002, Defendant-Sinclair threatened the new Board with a number of baseless

26  charges, including claims that the prior board of the FHOA had not resigned.  *Id.*, ¶ 25 at 9:15.5-16.

27     In March 2003, Defendant-Sinclair and the Other State Court Plaintiffs doctored a summons

28  and prepared an amended complaint, and then served both documents on CEMG and Mr. Katakis

1    without approval of the court. The doctored summons and amended complaint had not actually been

2    filed, and Defendant-Sinclair then allowed the "litigation" to proceed for months. *Id.*, ¶ 26 at 9:17-

3    18.5

4          Then in May 2003, Defendant-Sinclair complained about Fox Hollow being in a state of

5    disrepair. Yet, Defendant-Sinclair and the Other State Court Plaintiffs still refused to pay dues. In

6    July 2003, as the FHOA attempted to move forward with a rehabilitation project, Defendant-Sinclair

7    wrote to the FHOA and advised that the FHOA's actions were done to damage Defendant-Sinclair.

8    Defendant-Sinclair's claims that the FHOA and other defendants were harming them by the

9    rehabilitation project were false. *Id.*, ¶ 27 at 9:19.5-22.

10          In November 2003, Defendant-Sinclair and the Other State Court Plaintiffs tendered $0 to

11   the FHOA when clearly Defendant-Sinclair knew that he and the Other State Court Plaintiffs had

12   not paid dues since May 2002. *Id.*, ¶ 28 at 9:23-23.5.

13          With respect to the Mauctrst, the State Court Decision determined that Defendant-Sinclair

14   made untrue statements to the bankruptcy court as to the ownership of Mauctrst, LLC,

15   misrepresenting that it was owned 50% by Mr. Mauchley and 50% by Mrs. Mauchley. State Court

16   Decision at 18:19-22. The State Court found Defendant-Debtor's denial of ownership Mauctrst,

17   LLC to not be credible. *Id.* at 18:7-12. Contrary evidence presented was that Defendant-Debtor

18   and Mr. Mauchley had filed numerous unlawful detainer actions in which the two of them stated

19   under penalty of perjury (verified complaints) to be the owners of units in the Fox Hollow Property.

20   *Id.* at 18:22-27.

21          The State Court Decision goes further, concluding that Mauctrst LLC was a fiction for

22   Defendant-Debtor to try and avoid obligations under the various deeds of trust secured by the Fox

23   Hollow Property. *Id.* at 18:27-28, 19:1.5-2.5.

24          The State Court Decision determined that the pattern of "unclean hands" conduct and

25   behavior of Defendant-Sinclair and the Other State Court Action Plaintiffs was pervasive as well

26   as endemic to the entire Fox Hollow project over the entire period of time involved in this case,

27   including, but not limited to:

28          (1) the manner of securing the subject promissory notes and deeds of trust;

(2) refusing to make payments and misrepresentation of making payments required under the subject promissory notes and deeds of trust;

(3) misusing the bankruptcy court to improperly delay and try to defeat the claims of the holders of the subject promissory notes and deeds of trust;

(4) misusing a preliminary injunction to delay foreclosures without making monthly payments;

(5) failing to timely form and fund an FHOA and failing to properly conduct the affairs of the FHOA;

(6) dealings and interacting with the FHOA and [Katakis Plaintiffs], after October 2002, related to the lots in issue;

(7) dealings with GMAC and defendants Katakis and CEMG with respect to Lots 11 and 18; and

(8) the other conduct further described and set forth in the incorporation by reference paragraphs.

*Id.*, p. 24:4.5-21.5.

The State Court Decision goes further, finding that "[Defendant-Sinclair and the Other State Court Plaintiffs] plan of non-payment of dues and assessments was systematic, continuous, and long standing." *Id.* at 14:15.5-16.5.

Given the nature and duration of the conduct, the State Court Decision determined that the "unclean hands" of Defendant-Sinclair and the Other State Court Action Plaintiffs was proximately related to Defendant-Debtor's and the Other State Court Action Plaintiffs' claims and the relief they sought. *Id.* The State Court found for Katakis Plaintiffs on their unclean hands defense against Defendant-Sinclair and the Other State Court Action Plaintiffs on all causes of action. The State Court went further, making specific findings and determinations for each of the causes of action asserted by Defendant-Debtor and the Other State Court Plaintiffs. For each of the causes of action, the State Court granted judgment for Katakis Parties on the merits, in addition to the "unclean hands" determination.

**Pattern of Conduct and Scheme of Defendant-Sinclair**

It is true that the State Court Decision shows a consistent, systematic pattern of conduct, and misconduct, by the Defendant-Sinclair with respect to the Fox Hollow Property. However, this court's consideration does not stop with merely that there was a judgment and the State Court

1    Decision used the words "unclean hands."  Fortunately, the State Court Decision makes very clear

2    determinations of the issues concerning Defendant-Sinclair's conduct.

3          As Defendant-Sinclair argues, the application of the doctrine of "Unclean Hands" does not

4    equal a determination of fraud.   Beginning with the case cited by Defendant-Sinclair,

5    *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 975(1999), "The doctrine

6    of unclean hands does not deny relief to a plaintiff guilty of any past misconduct; only misconduct

7    directly related to the matter in which he seeks relief triggers the defense. (11 Witkin, Summary of

8    Cal. Law (9th ed. 1990) Equity, § 10, p. 686.)."

9          In considering the actual conduct in the findings and determinations in the State Court

10   Decision, this court determines that Defendant-Sinclair engaged in an intentional, willful multi-year

11   pattern of conduct of misrepresentations and actions against others which were without factual or

12   colorable legal foundation.  This is consistent with Defendant-Sinclair's conduct in this court, in

13   which this court has concluded that Defendant-Sinclair will say, assert, or argue anything he believes

14   will sound in his favor, without regard to factual support or legal merits, and without regard to the

15   harm done to others.

16         While it is not clear what long-term property development goals Defendant-Sinclair was

17   trying to accomplish with his misrepresentations and willful and malicious conduct, it is clear that

18   he was obtaining short term economic benefits from the Fox Hollow Properties appearing to be

19   subdivided, the loans obtained thereon, and the fees he was paid for "managing" the project.  This

20   economic benefit was sustained by the scheme of willful and malicious conduct of Defendant-

21   Sinclair.

22         The significant damage to others manifests when Defendant-Sinclair went out and obtained

23   the loans on the 15 lots for which the invalid Subdivision Map 2 had been filed.  In apparent reliance

24   on said invalid Subdivision Map 2, these loans were made and Defendant-Sinclair continued to

25   manage and make money from the Fox Hollow Property.

26         Then, battles erupted when the lenders, not having been paid, tried to foreclose.  The State

27   Court Decision cites to specific misrepresentations made by Defendant-Sinclair in the receivership

28   proceedings.  It is clear that Defendant-Sinclair used his litigation strategy of saying whatever,

irrespective of truth and legal merit, and then asserting threats, to try and continue in his control of the Fox Hollow Property.

It was not until 2002 when Katakis Plaintiffs entered the picture, purchasing the two lots of the Fox Hollow Property from GMAC. With that purchase, Katakis Plaintiffs became targets of Defendant-Sinclair's (1) wrongful acts, (2) done intentionally, (3) which necessarily causes injury, and (4) done without just cause or excuse. Defendant-Sinclair then waged a multi-decade campaign of litigation, losing at trial both on the merits and because his conduct in the underlying transactions involving Fox Hollow (to keep it out of the hands of creditors and purchasers at foreclosure sales) was "conduct that violates conscience, or good faith, or other equitable standards of conduct" "relate[d] directly to the cause at issue" with Katakis Plaintiffs in the State Court Action. While the conduct against Katakis Plaintiffs was not unique to Katakis Plaintiffs, they had the litigation fortitude to assert their rights against Defendant-Sinclair.

**District Court of Appeals Rulings Affirming State Court Decision and Subsequent Award of Attorneys' Fees and Costs**

Interestingly, the DCA Opinion affirming the Final State Court Judgment provides some additional information about the award of attorneys' fees and Defendant-Sinclair's conduct. The DCA Opinion includes a detailed history of Defendant-Sinclair's conduct in handling the Fox Hollow Property and his dealings, and misdealings, with others. Issue after issue on appeal for Defendant-Sinclair fails - many for the fundamental failure to provide citation to the record or present grounds to reverse the appeal. Instead, most of what Defendant-Sinclair attempted to do was just relitigate anew the issues which were determined at trial, ignoring his burden on appeal. A common response of the DCA to Defendant-Sinclair's contentions is shown by the following statement:

Moreover, plaintiffs [Defendant-Sinclair], in arguing these issues, ignore that they bore the burden of proof at trial and now bear the burden to show error on appeal under the applicable standard of review.

DCA Opinion, p. 40.

The conclusion this court draws from the DCA Opinion affirming the Final State Court Judgment is that Defendant-Sinclair filed and prosecuted the appeal without regard to the merits of

1    his contentions. Rather, Defendant-Sinclair intended to do so in a manner designed to cause Katakis

2    Plaintiffs to incur significant legal fees without there being any merit to Defendant-Sinclair's

3    contentions. Defendant-Sinclair sought to intentionally impose those economic damages on Katakis

4    Plaintiffs in an effort to cause so much in damages that Katakis Plaintiffs would give up, not based

5    on the merits of the claims, but the huge financial burden imposed on them by Defendant-Sinclair.

6         The DCA revisited Defendant-Sinclair's conduct in the DCA Attys Fee Opinion. Defendant-

7    Sinclair's appeal of the attorneys' fees awarded by the State Court on remand after the DCA

8    affirmed the State Court Decision.

9         The improper conduct of Defendant-Sinclair is addressed in the DCA Attys Fee Opinion,

10   discussing Defendant-Sinclair's contention that the trial court improperly refused to continue the

11   hearing on attorney's fees. Part of Defendant-Sinclair's contention was that the trial court and

12   parties "violated a federal court order" by conducting the attorneys' fees hearings. First, the DCA

13   panel noted that Defendant-Sinclair did not present any such order to the trial court and raised it for

14   the first time on appeal. Second, Defendant-Sinclair failed to provide a copy of any such federal

15   order in the record on appeal. Finally, "[Defendant-Sinclair's] claim is based on a misrepresentation

16   of the substance and effect of the federal court documents." DCA Attys Fee Opinion at 7. The DCA

17   panel concluded that there was no federal order restraining Katakis Plaintiffs from taking any action.

18        The DCA panel further noted that in his opening appellant's brief, Defendant-Sinclair failed

19   to include citations to the record. *Id.* at 10. When citations were provided in the reply brief by

20   Defendant-Sinclair, they did not necessarily support the contention made in the reply brief. *Id.*

21        In response to Defendant-Sinclair's contention that the award of attorneys' fees should be

22   reversed because of an alleged disqualifying conflict, the DCA panel stated that Defendant-Sinclair

23   waited to assert the issue for more than two years after counsel became involved in the case and

24   more than a year after the trial.

25        The rulings of the DCA in these two appeals demonstrate that Defendant-Sinclair is

26   consistent in his litigation strategy and larger scheme of willful and malicious conduct to retain

27   control of the Fox Hollow Property. Without regard to the legal merits of his contentions, without

28   regard to the truth of the factual contentions asserted, Defendant-Sinclair willfully and intentionally

continues in his scheme to financially abuse anyone who would not capitulate to his desires concerning the Fox Hollow Property.

Based on the Findings and Determinations in the State Court Decision, which has been affirmed on appeal, this court grants the Motion for Summary Judgment, determining that pursuant to 11 U.S.C. § 523(a)(6) the obligations to Katakis Plaintiffs on the Final State Court Judgment, including the awards of attorneys' fees on appeal, are nondischargeable.

### Additional Findings of State Bar Court Supporting
### Granting of Summary Judgment for 11 U.S.C. § 523(a)(6) Relief

Even though the findings and determinations of the State Court are sufficient for the granting of the Motion for Summary Judgment pursuant to 11 U.S.C. § 523(a)(6), the findings of the State Bar Court give further support for such ruling. The State Bar Court Decision amplifies the determinations of Defendant-Sinclair's sharp dealings, ethical breaches, meritless ligation strategies, and intentional abusive conduct. Defendant-Sinclair's conduct was sufficiently egregious that even under the clear and convincing standard of evidence required in a disbarment proceeding, the State Bar Court ruling was against Defendant-Sinclair.

The State Bar Court ties in the Mauctrst bankruptcy case as part of Defendant-Sinclair's scheme, stating that Defendant-Sinclair failed to account in the Mauctrst bankruptcy case for the proceeds of two fire insurance claims, and more than 50 cancelled checks and two bank statements were missing. Additionally, Defendant-Sinclair failed to account to the trustee for $135,000.00 Defendant-Sinclair received from Mauctrst between August 1998 and June 1999. State Bar Court Decision, p. 9; Exhibit 12, Dckt. 79. The State Bar Court judge determined that one of the economic benefits that Defendant-Sinclair obtained from the control of the Fox Hollow Property was that he was paid a monthly salary of $10,600.00 to manage the Fox Hollow Property. *Id.* at 8.

As part of the scheme of willful and malicious conduct, the State Bar Court determined that after the Mauctrst bankruptcy case was closed and the lenders pursued foreclosure, "Defendant-Sinclair on behalf of Mauchley and Mauctrst, filed 15 actions against the lenders to delay foreclosure." *Id.* at 10. The State Bar Court concluded that Defendant-Sinclair did not pursue colorable claims for Mauctrst, but filed the fifteen lenders in actions "to delay foreclosure."

1    In an action against ContiMortgage and Lonestar Mortgagee Services, LLC (Lonestar),

2    Stanislaus Superior Court, Case No. 254996, the State Bar Court found that Defendant-Sinclair

3    misrepresented that the court's preliminary injunction applied to lots not included in the preliminary

4    injunction. *Id.*

5    In addition to being paid to "manage" Fox Hollow, the State Bar Court found that Defendant-

6    Sinclair was then engaged to represent the FHOA, being paid $50,000.00 to assist in the formation

7    of the association in 2000, four years after Defendant-Sinclair represented that it had been created.

8    *Id.* at 11. Here is further economic benefit Defendant-Sinclair was obtaining from keeping control

9    of the Fox Hollow Property.

10   With respect to Defendant-Sinclair attempting to purchase the property through undisclosed

11   double escrows, the State Bar Court determined that Defendant-Sinclair's testimony that the lender

12   (GMAC) did not care there was an undisclosed double escrow that would result in Defendant-

13   Sinclair (and his indistinguishable alter-egos) still being the "borrower" who owed the money to

14   GMAC was not credible. *Id.* at 13. This lack of disclosure is part of the "anything goes" intentional

15   conduct of Defendant-Sinclair to keep Fox Hollow at all costs (to others). The State Bar Court

16   found credible the lender's witness who stated that "her goal for GMAC was 'to get rid of

17   [Defendant-Sinclair], Mauchley, et cetera, people for all time." *Id.*

18   In connection with the litigation, in June 2002 Defendant-Sinclair represented to the court

19   that all of the FHOA board members had resigned when the state court receiver was appointed. *Id.*

20   at 15. Then, just six months later Defendant-Sinclair asserted in writing to Katakis Plaintiffs and

21   the new members of the FHOA that Defendant-Sinclair, Mauchley and Brandon (Defendant-

22   Sinclair's son) had not resigned from the board. *Id.* This further shows the continuing, intentional,

23   willful, misconduct of Defendant-Sinclair as part of his ongoing scheme to cause harm and

24   economic damage to others.

25   The State Bar Court concluded that Defendant-Sinclair had an intentional scheme to defraud

26   that rose to the level of moral turpitude, dishonesty, and corruption in violation of Business and

27   Professions Code § 6106. *Id.* at 24. This conduct included skimming off loan proceeds, filing

28   bankruptcies and lawsuits for purposes of delaying foreclosure sales and to keep control of the Fox

Hollow Property, and providing false testimony and misrepresentations to the court to conceal and perpetuate his scheme. *Id.*

The State Bar Court, applying a clear and convincing burden of proof standard, concluded that Defendant-Sinclair engaged in a pattern of misconduct and deception, spanning back to 1994. *Id.* at 29. This is consistent with this court's conclusion that Defendant-Sinclair's conduct was not inadvertent, isolated, or a mistake, but an intentional series of intentional acts intended to cause harm to any who did not capitulate to Defendant-Sinclair's desires to keep control of the Fox Hollow Property. As this court has concluded, the State Bar Court Decision includes the determination that:

> During this time [1994 through the District Court Action] [Defendant-Sinclair] has consistently and repeatedly engaged in deceptive and improper conduct in an effort to procure personal financial gain. The length and extent of [Defendant-Sinclair's] pattern of misconduct warrant significant weight in aggravation.

*Id.* at 30-31.

The State Bar Court also determined that Defendant-Sinclair's misconduct as part of his scheme resulted in significant harm to Katakis Plaintiffs, forcing them to unwind Defendant-Sinclair's pattern of misconduct at a cost Katakis over $1.3 million dollars in attorney's fees, as well the damage to Mr. Katakis' emotional and physical well-being. *Id.* at 31.

The misconduct of Defendant-Sinclair was serious enough for the State Bar Court to conclude that he should be disbarred. Upon review of the decision, the California Supreme Court concurred, disbarring Defendant-Sinclair from the practice of law.

The findings and determinations of the State Bar Court which are given collateral estoppel effect are additional to, and in themselves provide a separate basis for granting the relief requested pursuant to 11 U.S.C. § 523(a)(6).

## RELIEF GRANTED

Pursuant to this Decision, the court shall issue a separate order:

1. Denying without prejudice the Motion for Summary Judgment seeking relief pursuant to 11 U.S.C. § 523(a)(2)(A) for actual fraud. The claims for such relief shall proceed to trial, if Katakis Plaintiffs elect to further pursue that portion of the litigation; and

2. Granting the Motion for Summary Judgment requesting relief pursuant to 11 U.S.C.

§ 523(a)(6) and for entry of a judgment determining that the obligations owing on the Final State Court Judgment, including all costs and attorneys' fees are nondischargeable.  The court shall enter judgment that the Final State Court Judgment and the obligations thereunder of Defendant-Sinclair are nondischargeable and not enter a monetary judgment to replace the Final State Court Judgment.

The court will defer entry of judgment on the 11 U.S.C. § 523(a)(6) claims until the other claims are litigated or dismissed, and enter one final judgment resolving all claims being asserted in this Adversary Proceeding.

Dated: May 02, 2017

By the Court

Ronald H. Sargis, Judge
United States Bankruptcy Court

# ADDENDUM A

**Findings and Determinations of the State Court
Given Collateral Estoppel Effect and
Determined to Not Be in Material Dispute
Fed. R. Civ. P. 56(g) and Fed. R. Bankr. P. 7056**

1.      "In April 1994, Mr. Sinclair wrote to the City of Turlock to advise them that there were  sufficient funds in the HOA. (D022.) Mr. Sinclair testified that he never told the City that there was an HOA before 1998 (687:5-15) and that there was no HOA before 2000. (689:6-9.) Mr. Sinclair's 1994 letter to the City of Turlock that there was an HOA was false."

Statement of Decision, ¶ 1 at 6:13.5 to 16.5; Dckt. 78.  (The page references are to the page number of the State of Decision itself, Exhibit 4, and not the gross page number for all of the documents in Exhibits 1-7 filed as Dckt. 78.)

2.      "From November 1995 through February 1997, Mr. Sinclair and Mr. Flake worked closely together to develop Fox Hollow. (D337 to D382; D390; D391.) Yet, Mr. Flake testified he had no involvement with Mr. Sinclair during this time. Clearly, this was not true."

*Id.*, ¶ 2 at 6:17.5-19.

3.      "In March 1996, [Defendant-Sinclair] subdivided Fox Hollow by recording Map No. 1. (J011.) The City required as a condition that a homeowner's association be formed. (DO10.) In September 1996, Plaintiffs recorded the CC&Rs. (D013.) The CC&Rs required formation of an HOA. [Defendant-Sinclair] did not do this."

*Id.*, ¶ 3 at 6:20-22.

4.      "In February 1997, Mr. Flake sold Fox Hollow to Mr. Mauchley by selling four separate lots through four separate deeds. (J014, J017, J019, J021.) Although the CC&Rs required him to convey the common area to the HOA before doing this, he did not do it."

*Id.*, ¶ 4 at 6:22.5-24.

5.      "In 1998, Mr. Sinclair worked to secure financing at Fox Hollow. Mr. Mauchley testified that Mr. Sinclair handled this work and that he, Mr. Mauchley, "didn't talk to any lenders." Mr. Sinclair testified that Mr. Mauchley was 'arranging for the most part the financing.'"

*Id.*, ¶ 5 at 6:25-26.

6.      "On or about July 21, 1998, [Defendant-Sinclair] caused Subdivision Map No.2 to be recorded creating an additional 15 lots. (J031.) [Defendant-Sinclair] knew that they had failed to complete the conditions imposed by the City for recording such a map. (D010, D012, D013.) [Defendant-Sinclair] also knew that the City had previously rejected their request to complete the required work after the map was recorded. (D016, D018, D021.)"

*Id.*, ¶ 6 at 6:27.5-28, 7:1-2.5.

7.      "In July 1998, immediately upon recording Map No.2, [Defendant-Sinclair] caused 15 loans to be placed against the 15 new lots. Mr. Mauchley signed fifteen deeds of trust (J032, J033, J034, J035, J037, J039, J041, J043 to J050) that contained Planned Unit

Development riders representing that there was a HOA. Yet, "there was no intention to start it then." (687:5-15.)"

*Id.*, ¶ 7 at 7:3.5-5.

8.     "In July 1998, [Defendant-Sinclair] obtained these 15 new loans based on values that were "subject to final completion of subdivision firewalls and underground relocation of utilities to accommodate individual ownership . . . " (J349; 4:11-14.) This material information was not disclosed to the lenders. [Defendant-Sinclair's] secured these loans was on a false premise."

*Id.*, ¶ 8 at 7:6-8.

9.     "In late 1998 and early 1999, [Defendant-Sinclair] began defaulting on the loans and were further encumbering the property with a $300,000 loan. (J064.) Mr. Mauchley testified he knew that [Defendant-Sinclair] were late on a more than a couple of payments, but Mr. Sinclair insisted that he had made wire transfers or other sorts of direct payments, but later recanted this testimony."

*Id.*, ¶ 9 at 7:9-11.

10.    "In April, May and June of 1999, lenders began to record notices of default on the July 1998 loans. (J066, J067, J068.)  On July 1, 1999, Mauctrst LLC filed bankruptcy. [Defendant-Sinclair] claimed that the bankruptcy filing had nothing to do with the pending non-judicial foreclosures and "that wasn't the consideration at all." (724:7-12.)"

*Id.*, ¶ 10 at 7:12-14.

11.    "In July 1999, Mr. Sinclair filed bankruptcy for Mauctrst LLC representing that it was owned 50% by Mr. Mauchley and 50% by Mrs. Mauchley. Mr. Mauchley testified at trial these statements were false. Richard Sinclair and Gregory Mauchley then had recently filed unlawful detainer actions verifying under oath that they owned the property. Since July 1999, [Defendant-Sinclair] have asserted that the automatic stay of the Mauctrst LLC bankruptcy should prevent Fox Hollow lenders from pursuing collection efforts even though (1) Richard Sinclair and Gregory Mauchley, not Mauctrst LLC, owned the property, (2) Mr. Mauchley, not Mauctrst LLC, was the obligor on the notes and deeds of trust."

*Id.*, ¶ 11 at 7:15-19.

12.    "Mr. Sinclair has testified in deposition, at trial and in letters that he sent that he is a member/manager of Mauctrst LLC and that member/manager owns owner. Mr. Sinclair has divulged that he directly benefitted in the amount of $160,000 from the Fox Hollow endeavor in the year before the July 1, 1999. Yet, he continues to claim he has no ownership interest in it."

*Id.*, ¶ 12 at 7:20-22.5.

13.    "In January 2000, [Defendant-Sinclair] began to attempt to negotiate significant discounts on their loans by drawing the lenders attention -- 18 months after they obtained the loans -- to the fact that their collateral was impaired for reasons solely attributable to [Defendant-Sinclair's] misconduct. (D057, D058, D065, D067.)"

*Id.*, ¶ 13 at 7:23.5-25.5.

14.    "In February 2000, lenders filed additional notices of default regarding Fox Hollow.

(J079 to J084.) In March 2000, [Defendant-Sinclair] began suing lenders and seeking restraining orders to delay those foreclosures. (E.g. J215.) In total, they filed seven lawsuits and lost nearly all of them."

*Id.*, ¶ 14 at 7:26.5-28.

15.     "On June 6, 2000, [Defendant-Sinclair] obtained a preliminary injunction which listed Lots 9 and 14 at Fox Hollow, but which they have claimed also pertained to Lots 3 and 7. (J232.) The injunction was conditioned on [Defendant-Sinclair] making "the required monthly payments on the promissory note as it comes due". Plaintiffs failed to make a single payment and enjoyed the benefit of the injunction until 2003."

*Id.*, ¶ 15 at 8:1.5-4.

16.     "Although [Defendant-Sinclair] prepared HOA minutes indicating that Mr. Mauchley was present at the first two HOA meetings (P002), Mr. Mauchley testified that he did not attend meetings. Plaintiffs' minutes indicate work was being done on and Mr. Sinclair billed Fox Hollow for doing work on Articles of Incorporation (P001) during the time period of August 2000 to December 2000. Yet, the Articles of Incorporation were signed and completed in July 2000, but simply not filed with the Secretary of State until December 2000. (D069.)"

*Id.*, ¶ 16 at 8:5-8.

17.     "In October 2000, [Defendant-Sinclair] provided the outstanding dues to escrow and volunteered to escrow that "title to the lots cannot be transferred at the present time". (D067.) Mr. Sinclair provided a declaration under penalty of perjury to the Court that this letter was sent "[o]ut of courtesy to the new owners and to elicit their cooperation". (J285, ¶ 17.) This is not credible.  A month later, [Defendant-Sinclair] sent out a HOA dues statement with a note at the bottom that there were potential purchasers interested in purchasing the lots at their "as is where is" price. (D348.)"

*Id.*, ¶ 17 at 8:9-12.5.

18.     "In February 2001, a receiver was appointed over [Defendant-Sinclair's] objection. (J285; J291.) The receiver appointment hearing reflects [Defendant-Sinclair's] misleading conduct. (J289.)"

*Id.*, ¶ 18 at 13.5-14.5.

19.     "In May 2001, [Defendant-Sinclair] entered a settlement agreement with GMAC that they secretly set up as a double escrow without disclosing to GMAC that the Sinclairs were the actual purchasers. In July 2001, [Defendant-Sinclair] failed to close with GMAC. Mr. Sinclair informed Mr. Mauchley that they missed the deadline. Mr. Sinclair even wrote correspondence acknowledging that the escrow "must close" within a time certain. (D093.) However, [Defendant-Sinclair] still claim that the date for the close of escrow was not a condition of their agreement with GMAC. (J332:4-12.)"

*Id.*, ¶ 19 at 8:15.5-19.

20.     "In December 2001, Brandon Sinclair took out a loan against Lot 1 at Fox Hollow (J140) and then transferred the property to an LLC (J148) that he and his father [Mr. Sinclair] formed to protect him from credit damage (Testimony of Brandon Sinclair) when they defaulted."

*Id.*, ¶ 20 at 8:20-21.5.

21.     "In May 2002, [Defendant-Sinclair] stopped making dues payments to the HOA."

*Id.*, ¶ 21 at 8:22.5.

22.     "In June 2002, over 10 months after the [Defendant-Sinclair] were to close escrow on Lots 11 and 18 and after GMAC had canceled the Settlement Agreement with [Defendant-Sinclair] (DI99), CEMG entered into a contract with GMAC to purchase those two lots. During trial, [Defendant-Sinclair] deleted information from an exhibit showing that Mr. Sinclair had not sent a copy of the GMAC settlement agreement until July 17, 2002. (P085 v. D368.)  This was done in an attempt to create the impression that [Defendant-Sinclair] had claimed they had a contract to purchase the properties before GMAC and CEMG completed their sale. Richard Sinclair's testimony regarding what he told Mr. Katakis before CEMG closed escrow was false."

*Id.*, ¶ 22 at 8:23.5-27.5.

23.     "On July 31, 2002, [Defendant-Sinclair] advised the Court in writing that: (a) after the Court appointed a receiver, "the Board resigned"; (b) there was "no board of directors to represent" the HOA; (c) "no direction has been provided"; and (d) elections should be held. (J309.)  [Defendant-Sinclair] failed to advise the HOA for two months after the new Board was elected that they believed they were the Board and only did so when it was apparent that the new Board was going to begin collecting dues and gather estimates for the repair work at Fox Hollow.  (P052.)

Mr. Sinclair explained why he told the Court this: "What I must have ineloquently represented to the Court was Mr. Katakis was buying us out. He had made us an offer of about $1 million. We were waiting to finalize that. And everybody wanted to get rid of this case because it had no other purpose. And so we weren't going to go to trial. We weren't going to go forward with it. And so I was telling the Court, you know, this is kind of done with." (595:27-596:6.) Thus, rather than admit that he had lied to the Court, Mr. Sinclair made up this story. First, the document he stated to the Court suggests nothing remotely like Mr. Sinclair's testimony. Second, the evidence is unequivocally clear that Mr. Katakis never offered them $1 million as Mr. Sinclair claims."

*Id.*, ¶ 23 at 9:1-10.5.

24.     "In October 2002, when the new Board and officers were elected at Fox Hollow, Fox Hollow was in a very poor condition. (D178.) It had been in the same condition when the Court was required to appoint a receiver for the homeowner's association. (J282; J286 and pictures attached to both declarations.) It had been in a deteriorating condition since as early as 1993. (D009.) Mr. Sinclair even admitted the deferred maintenance. (J285, ¶ 9, p. 4.) Yet, Plaintiffs continue to claim that they had no role in the condition of Fox Hollow."

*Id.* , ¶ 24 at 9:11.5-14.5.

25.     "In December 2002, [Defendant-Sinclair] threatened the new Board with a number of baseless charges while claiming that the prior Board had in fact not resigned."

*Id.*, ¶ 25 at 9:15.5-16.

26.     "In March 2003, Plaintiffs doctored a Summons (J228) and prepared an Amended Complaint (J237) and served both documents on CEMG and Mr. Katakis without Court approval, without them being filed and then allowed the litigation to proceed for months."

*Id.*, ¶ 26 at 9:17-18.5

27.     "In May 2003, [Defendant-Sinclair] complained about Fox Hollow being in a state of disrepair. (D238.) Yet, [Defendant-Sinclair] still refused to pay dues. In July 2003, as the HOA attempted to move forward with a rehabilitation project, [Defendant-Sinclair] wrote to the HOA and advised that the HOA's actions were done to damage [Defendant-Sinclair]. (D259.) [Defendant-Sinclair's] claims that the HOA and other defendants were harming them by the rehabilitation project were false."

*Id.*, ¶ 27 at 9:19.5-22.

28.     "In November 2003, [Defendant-Sinclair] tendered $0 to the HOA when clearly [Defendant-Sinclair] knew that they had not paid dues since May 2002. (P019; P021.)"

*Id.*, ¶ 28 at 9:23-23.5.

The State Court expressly made the 28 above findings as part of its Statement of Decision in rendering judgment for Katakis Plaintiffs in the State Court Action. *Id.*, p. 23:19.5-22.5. These are the 28 "Unclean Hands" findings at issue. The court does not give to them any special significance to the words "Unclean Hands" as the conclusion of the State Court, but accepts the individual findings and determinations by the State Court.

In addition to the above, the State Court Decision includes the additional findings and determinations:

29.     "[Defendant-Sinclair, Mauctrst LLC, Lairtrust LLC, Capstone LLC, Capstone Trust, Stan Flake, Brandon Sinclair, and Gregory Mauchley, the plaintiffs in the State Court Action] are indistinguishable from one another for the purposes of the doctrine as Mr. Sinclair was acting for them and Mauctrst was a sham and alter ego for Mr. Sinclair and Mr. Mauchley."

*Id.*, at 23:22.5-24.5.

30.     "One of the plaintiffs, [Defendant-Sinclair], is a veteran, California attorney, residing in Stanislaus County. He is in the private practice of law and also involved in real estate development and real estate law."

*Id.* at 2:23.5-25.5.

31.     "In February 1993, [Defendant-Sinclair] applied to the City of Turlock to subdivide Fox Hollow into 19 lots and a common area in order to accomplish a planned unit development (PUD) thus invoking the legal requirements of the Davis-Stirling Common Interest Development Act (Civil Code §§ 1350, *et. seq.*). The application for the subdivision/conversion was approved by the City of Turlock in the spring of 1993, subject to various conditions, such as building code compliance for separate utility service for each individual lot, erection of firewalls and creation of a homeowners association."

*Id.* at 4:4.5-10.5.

32.     "Given [Defendant-Sinclair's and the Other State Court Plaintiffs'] knowledge of the importance of the payments of dues and assessments and their willing non-compliance in making such payments, notifying Plaintiffs of any rules and procedures in order to satisfy a claim for code compliance would have been an idle act. Plaintiffs also had far more than the statutorily contemplated notice associated with a homeowner's association foreclosure and yet at no time tendered any money."

*Id.* at 14:11.5-15.5.

32.     "[Defendant-Sinclair's and the Other State Court Plaintiffs'] plan of non-payment of dues and assessments was systematic, continuous and long-standing."

*Id.* at 14: 15.5-16.5.

33.     "Moreover, [Defendant-Debtor's and the Other State Court Plaintiffs'] claim that [Defendant-Sinclair], Brandon Sinclair and Gregory Mauchley were directors at the time contradicts [Defendant-Sinclair's] representation to the court that at that time there was no board, no direction for the BOA and an election should be held. (J309, p. 2.)"

*Id.* at 15:13.5-16.5.

34.     "[Defendant-Debtor's and the Other State Court Plaintiffs'] either made a false statement to the Court in the Receivership action (J309), or at trial, about the Board resigning."

*Id.* at 15:24.5-25.5.

35.     "Leading up to the bankruptcy filing in 1999 and thereafter, [Defendant-Sinclair], Mr. Mauchley and Mauctrst operated as an indistinguishable enterprise with [Defendant-Sinclair] having authority to act on behalf of Mr. Mauchley and Mauctrst. [Defendant-Sinclair] has testified in deposition and at trial and stated in letters that he sent to tenants at Fox Hollow that he was a member/manager of Mauctrst LLC, and he admitted under oath that member/manager means owner."

*Id.* at 18:7-12.

36.     "Yet, [Defendant-Sinclair, notwithstanding the above testimony] he denied ownership of Mauctrst LLC at trial. The court did not find Mr. Sinclair's denial of ownership credible."

*Id.* at 18:12-13.

37.     "[Defendant-Debtor's and the Other State Court Plaintiffs'] claimed that the bankruptcy filing had nothing to do with the pending non-judicial foreclosures and "that wasn't the consideration at all." (724:7-12.) However, the court did not find such testimony credible."

*Id.* at 18:15-18.

38.     "In July 1999, [Defendant-Debtor] filed bankruptcy for Mauctrst representing that it was owned 50% by Mr. Mauchley and 50% by Mrs. Mauchley. Mr. Mauchley testified at trial these statements were false.  As such, basic representations were made to the bankruptcy court regarding ownership of Mauctrst that were untrue."

*Id.* at 18:19-22.

39.     "Moreover, at the time Mauctrst filed for bankruptcy, Mauctrst did not even have a signed operating agreement and Mr. Sinclair had filed numerous unlawful detainer actions for units at Fox Hollow asserting under oath he ([Defendant-Sinclair]) and Mr. Mauchley as individuals were owners of the Fox Hollow property, not Mauctrst.  Plaintiffs also asserted in the bankruptcy court that Mauctrst merely had the right to operate the property, and Mr. Mauchley owned the property."

1 | *Id.* at 18:22-27.

2         40.   "The Court determines that Mauctrst LLC was a fiction designed to allow the misuse

3 of the bankruptcy court and to attempt to avoid Defendant-Debtor's and the Other State Court Plaintiffs'] obligations under various deeds of trust, including, but not limited, to Lots

4 3, 7, 9 and 14, and other obligations of [Defendant-Debtor's and the Other State Court Plaintiffs']."

5 | *Id.* at 18:27-28, 19:1.5-2.5.

6         The judge in the State Court Action summarized the determination that the Doctrine of

7 Unclean Hands precludes any recovery by Defendant-Sinclair (and the other alter-ego plaintiffs in the State Court Action), concluding:

8         "The pattern of "unclean hands" conduct behavior of [Defendant-Sinclair]

9 was pervasive as well as endemic to the entire Fox Hollow project over the entire period of time involved in this case, including, but not limited to: (1) the manner of

10 securing the subject promissory notes and deeds of trust; (2) refusing to make payments and misrepresentation of making payments required under the subject

11 promissory notes and deeds of trust; (3) misusing the bankruptcy court to improperly delay and try to defeat the claims of the holders of the subject promissory notes and

12 deeds of trust; (4) misusing a preliminary injunction to delay foreclosures without making monthly payments; (5) failing to timely form and fund an HOA and failing

13 to properly conduct the affairs of the HOA; (6) dealings and interacting with the HOA and [Katakis Plaintiffs], after October 2002, related to the lots in issue; (7)

14 dealings with GMAC and defendants Katakis and CEMG with respect to Lots 11 and 18; and (8) the other conduct further described and set forth in the incorporation by

15 reference paragraphs. It is fortunate that the unclean hands doctrine is applicable to both legal and equitable settings.

16         Given the nature and duration of the conduct, this court finds that the

17 "unclean hands" of [Defendant-Debtor] is proximately related to [Defendant-Debtor's] claims and the relief they seek, such that the court finds for

18 [Katakis Plaintiffs] on their unclean hands defense against [Defendant-Debtor] on all causes of action and for this separate and independent reason finds in favor of

19 [Katakis Plaintiffs] on each of the causes of action in [Defendant-Debtor] Fifth Amended Complaint."

20 | *Id.*, p. 24:4.5-21.5.

21

22

23

24

25

26

27

28

75

# ADDENDUM B

**Findings and Determinations of the State Bar Court
Given Collateral Estoppel Effect and
Determined to Not Be in Material Dispute
Fed. R. Civ. P. 56(g) and Fed. R. Bankr. P. 7056[15]**

A.  "In January 1994, respondent, through Sinclair Enterprises, asked to modify the condition requiring all building code revisions to be completed before the final map could be recorded. The City of Turlock denied the request a month later. Respondent wrote the City, stating "[t]here are sufficient funds within the homeowners association" to perform some of the modifications. This was a misrepresentation, as there was no homeowners association."

State Bar Court Decision, p. 4; Exhibit 12, Dckt. 79.

B.  "Even though the required modifications [to the Fox Hollow Property] were not completed, [Defendant-Sinclair], on February 20, 1998, filed a "Notice of Completion" of the subdivision project."

*Id.* at 7.

C.  "Granite Bay Funding, which made loans on lots 3, 7, 9, and 14, did not know the subdivision work had not been completed. Had it been aware of that fact, it would not have made the loans until the work was complete. The civil trial court concluded the July 1998 loans were obtained "on a false premise." This conclusion was also supported by the evidence contained in the present record."

*Id.* at 8.

D.  "In addition, [Defendant-Sinclair] failed to account [in the Mauctrst bankruptcy case] for the proceeds of two fire insurance claims, and over 50 cancelled checks and two bank statements were missing. Finally, [Defendant-Sinclair] he failed to account to the trustee for $135,000 he had received from Mauctrst between August 1998 and June 1999."

*Id.* at 9.  Mauctrst was an entity formed by Defendant-Sinclair, which paid Defendant-Sinclair a monthly salary of $10,600 to manage the Fox Hollow Property.  *Id.* at 8.

E.  "After Fox Hollow reverted to Mauctrst in January 2000, [Defendant-Sinclair] attempted to purchase the notes from the foreclosing lenders for his "clients." At the civil trial, [Defendant-Sinclair] could not remember which clients. [Defendant-Sinclair] offered a reduced price because many of the units securing the notes could not be resold individually since the subdivision work was not complete.   For example, in January 2000, just 18 months after Mauchley borrowed $130,000 against lot 3, respondent offered to pay the lender $80,000 for the note because the lot was not individually saleable."

*Id.* at 9-10.

---

[15]  The court uses a letter paragraph identification methodology for the State Bar Court Decision findings and determination to distinguish them from the State Court Decision.

F. "After the property reverted to Mauctrst [after its bankruptcy case was closed], the lenders again pursued foreclosures. [Defendant-Sinclair] on behalf of Mauchley and Mauctrst, filed 15 actions against the lenders to delay foreclosure."

*Id.* at 10.

G. "In an action against ContiMortgage and Lonestar Mortgagee Services, LLC (Lonestar), Stanislaus Superior Court, case no. 254996, Mauchley and Mauctrst sought a restraining order and preliminary injunction barring foreclosures on lots 9 and 14. The pleading respondent prepared pertained to lots 9 and 14 only."

*Id.*

H. "The order [Defendant-Sinclair] prepared [in the above ContiMortgage action] for the judge's signature after the hearing, however, states that defendants were enjoined from conducting a foreclosure sale on lots 9 and 14 "or any Lots in the Fox Hollow subdivision . . . . At the civil trial, [Defendant-Sinclair] and Mauctrst contended the preliminary injunction also applied to lots 3 and 7.

*Id.*

I. "Despite the City of Turlock's subdivision approval condition in 1996 that required the formation of a homeowners association and similar language in the CC&R's, respondent testified at the civil trial that the Fox Hollow Owners' Association (FHOA) had to be formed only upon the sale of the first lot to a second owner. Therefore, when the first foreclosure by a lender was imminent, respondent held the first meeting of the FHOA on June 1, 2000, and prepared the minutes."

*Id.* at 11.

J. "The directors [of FHOA] agreed to waive [Defendant-Sinclair's] conflict of interest as a manager of Mauctrst and employed him as the association's legal counsel at $225 per hour or approximately $50,000 for his services that year to assist with the FHOA formation."

*Id.* at 12.

K. " In February 2001, Ocwen Federal Bank, F.S.B. (Ocwen Bank), a lender on four of the foreclosed lots, applied to have a receiver appointed for the FHOA because of deterioration of the buildings and common area. The court-appointed investigator reported that Fox Hollow was in very poor condition. The property was littered with garbage, discarded furniture, disabled vehicles, and abandoned shopping carts. The landscaping and pool were not maintained, and the pool had a strong sewage odor. In addition, the FHOA had shoddy bookkeeping practices and had grossly misused its funds. That misuse included paying respondent $15,266 for attorney fees while spending only $9,419 on property-related matters. Over [Defendant-Sinclair's] opposition, a receiver was appointed."

*Id.*

L. "After GMAC foreclosed on lots 1, 11, 18, and 19, the Mauchley/Mauctrst lawsuit against GMAC for damages remained. In May 2001, GMAC, Mauchley, Mauctrst, and Flake (for Capstone Trust) entered into a settlement agreement . . . [Defendant-Sinclair] set up double escrows for the purchase of lots 1 and 19. 8 He testified in

the civil trial that Mauchley and Mauctrst owed him substantial attorney fees and wanted those fees to be paid. As payment for those fees, respondent agreed to take the lots and give one lot to his son, Brandon, because he had worked "on the project."

M.    "[Defendant-Sinclair] testified in the civil and present trials that GMAC was aware of the double escrows and it did not matter to them. FN.9. GMAC's attorney, who had approved the settlement agreement for GMAC, testified in the civil trial that she never would have agreed to the double escrows had she been aware of them. Her goal for GMAC was 'to get rid of [Defendant-Sinclair], Mauchley, et cetera, people for all time.'"

*Id.* at 13.

FN.9.  "[Defendant-Sinclair's] assertion that GMAC did not care about a double escrow is unbelievable. [Defendant-Sinclair's] testimony on this subject lacks credibility."

*Id.*

N.    "On October 4, 2002, [Defendant-Sinclair] wrote Katakis asking to have the [FHOA] meeting rescheduled because he would be in trial in Fresno. He stated he represented himself; Mauctrst; Brandon; Mauchley; Capstone, LLC; Lairtrust, LLC; and Flake collectively, who owned more than 5 percent of Fox Hollow. [Defendant-Sinclair] did not assert that he, Brandon, and Mauchley were the current board of directors. And, three months earlier in July 2002, [Defendant-Sinclair] wrote in a statement filed with the court that the FHOA board members had resigned when the receiver was appointed, and it was logical to hold elections for a board of directors to carry out the work of the FHOA."

*Id.* at 15.

O.    "On December 16, 2002, respondent sent a letter to Katakis and the FHOA claiming that the former board--himself, Mauchley and Brandon--had not resigned, and he had not been given credit for attorney fees that the FHOA owed to him while the receiver was in place."

*Id.* at 16.

The State Bar Court Decision makes the following additional specific findings with respect to the claims asserted against Defendant-Sinclair in the State Bar Court Action:

P.    Count One - § 6106 [Moral Turpitude - Scheme to Defraud]

1.    "The evidence before this court demonstrates that respondent engaged in a fraudulent real estate scheme involving the Fox Hollow complex, including but not limited to: (1) creating the false appearance of a homeowners association and individually saleable lots; (2) seeking and obtaining loans secured by portions of Fox Hollow based on false pretenses and misrepresentations; (3) skimming off loan proceeds, dues collected in the name of the FHOA, rental income, and tenant deposits; (4) filing bankruptcies and lawsuits to try and delay foreclosures and/or keep the lots; and (5) providing false testimony and misrepresentations to the civil courts to conceal and perpetuate the scheme to defraud."

1  State Bar Court Decision, p. 24; Exhibit 12, Dckt. 79.

2           2.  "By engaging in the scheme to defraud, including perpetuation of the scheme
          through an alter ego, respondent committed acts involving moral turpitude,
3         dishonesty, and corruption, in wilful violation of Business and Professions
          Code, section 6106."

4  *Id.*

5       Q.  Count Three - § 6106 [Moral Turpitude - Misrepresentation]

6           1.  "In Count Three, the State Bar alleged that respondent committed various
          acts of misrepresentation constituting moral turpitude. However, this court
7         already relied on these same facts to establish [Defendant-Sinclair's]
          culpability in Count One. The appropriate resolution of this matter does not
8         depend on how many rules of professional misconduct or statutes proscribe
          the same misconduct. (*In the Matter of Torres* (Review Dept. 2000) 4 Cal.
9         State Bar Ct. Rptr. 138, 148.) Count Three is therefore dismissed with
          prejudice, as duplicative."

10

11  *Id.* at 24.

12       R.  Pattern of Misconduct (Std. 1.5(c).)

13           1.  "In the Fox Hollow matter, the trial and appellate courts concluded that
          [Defendant-Debtor's and the Other State Court Plaintiffs'] conduct
14        constituted a pattern of misconduct and deception. This court agrees, noting
          that Defendant-Sinclair's misconduct spanned from 1994 through the
15        underlying civil trial."

16  *Id.* at 29.

17           2.  "During this time [1994 through the District Court Action] [Defendant-
          Sinclair] has consistently and repeatedly engaged in deceptive and improper
18        conduct in an effort to procure personal financial gain. The length and extent
          of [Defendant-Sinclair's] pattern of misconduct warrant significant weight
19        in aggravation."

20  *Id.* at 30-31.

21

22           3.  "[Defendant-Sinclair's] actions demonstrate his indifference toward
          rectification or atonement for the consequences of his misconduct. Despite
          overwhelming evidence to the contrary, [Defendant-Sinclair] maintains he
23        did nothing wrong and sees himself as the victim. Further, [Defendant-
          Sinclair] has not taken any steps to rectify the harm he has caused.
24        Consequently, [Defendant-Sinclair's] indifference toward rectification or
          atonement for the consequences of his misconduct warrants significant
25        consideration in aggravation."

26  *Id.* at 31.

27  ///

28  ///

4. "[Defendant-Sinclair's] misconduct resulted in significant harm to Katakis and the administration of justice. Fighting and unwinding [Defendant-Sinclair's] pattern of misconduct has cost Katakis over $1.3 million dollars in attorney's fees and has taken a toll on his emotional and physical wellbeing. Further, [Defendant-Sinclair's] misconduct and stalling tactics have resulted in a waste of judicial resources."

*Id.*

5. "Disbarment often has been imposed in those instances, such as here, where an attorney has engaged in a pattern of serious misconduct because "only the most serious instances of repeated misconduct over a prolonged period of time" are characterized as demonstrating such a pattern. (*Levin v. State Bar* (1989) 47 Cal.3d 1140, 1150, fn. 14; *Garlow v. State Bar*, 44 Cal.3d 689, 711-712 [disbarment warranted where attorney's behavior of making false statements to the courts, failing to communicate with clients, failing to competently perform, failing to return client documents and property, and inducing others to testify falsely constituted a serious pattern of misconduct involving recurring types of wrongdoing]; *In the Matter of Hindin* (Review Dept. 1997) 3 Cal. State Bar Ct. Rptr. 657, 686-687 [disbarment recommended where attorney's 10-year pattern of neglecting client matters indicated a continuous course of professional misconduct].)"

*Id.* at 33.

6. "[Defendant-Sinclair's] numerous and repeated instances of deception and fraud relating to the Fox Hollow property demonstrate that he is unable or unwilling to conduct himself in a manner consistent with settled standards of professional responsibility in this state."

*Id.*

7. "Based on [Defendant-Sinclair's] testimony and demeanor, there is little indication that respondent has gained any insight and understanding regarding the present misconduct."

*Id.*

# Instructions to Clerk of Court
**Service List - Not Part of Order/Judgment**

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below*. The Clerk of Court will send the document via the BNC or, if checked _____, via the U.S. mail.

| **Debtor-Defendant**<br><br>Richard Carroll Sinclair<br>P.O. Box 1628<br>Oakdale, CA 95361 | **Attorney for the Debtor-Defendant**(s) (if any) |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case)<br><br>Gary Farrar<br>P.O. Box 576097<br>Modesto, CA 95357 | Office of the U.S. Trustee<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA 95814 |
| Aaron A. Avery<br>2150 River Plaza Drive, Ste. 450<br>Sacramento, CA 95833 | D. Greg Durbin<br>5 River Park Place E<br>P.O. Box 28912<br>Fresno, CA 93729-8912 |
| Hilton A. Ryder<br>7647 N. Fresno Street<br>Fresno, CA 93720 | |
| *Courtesy Copy via Email*:<br><br>Richard Carroll Sinclair<br><br>rsinclairlaw@msn.com | |

81